**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

CONTI 11. CONTAINER
SCHIFFARTS-GMBH & CO. KG MS
"MSC FLAMINIA"

VERSUS

MSC MEDITERRANEAN SHIPPING
COMPANY S.A.

CIVIL ACTION NO.

JUDGE

MAGISTRATE

## DECLARATION OF CHRISTOPHER GARLEY

1. I am over 18 years of age and am competent to make this declaration.

2. I am Solicitor qualified to practice in England and Wales.

3. I was retained by Conti 11. Container Schiffarts-GBMH & Co. KG MS "MSC
   FLAMINIA" ("Conti") to provide legal representation to it in relation to claims brought
   by Conti against MSC Mediterranean Shipping Company S.A. ("MSC") arising out of an
   incident that occurred aboard the MSC FLAMINIA.

4. Conti's claims against MSC proceeded to independent arbitration in London pursuant to
   the terms of a Time Charter between the parties, which was duly executed by MSC and
   Conti on or about 3 November 20000.

5. I hereby certify that the copy of the Time Charter, attached to this Declaration as Exhibit
   1, is a true and accurate copy of the original Time Charter.

6. Following proceedings before the independent arbitrators, Julia Dias QC, Sir David Steel,
   and Stephen Hofmeyer QC, a series of awards were issued:

   a. On 8 February 2021, the arbitrators issued a "Partial Final Award,"

   b. On 30 March 2021, the arbitrators issued a "Second Partial Final Award,"


EXHIBIT A

    c.   On 30 July 2021, the arbitrators issued a "Third Partial Final Award," and,

    d.   On 1 September 2021, the arbitrators issued a "Third Partial Final Award Correcting Memorandum" (collectively, the "Award").

7.   Together, the four awards represent the full and final judgment of the arbitrators and results in a total Award in favor of Conti and against MSC, including accrued interest, in excess of approximately US$200 million (this being an approximate total amount taking into account the fact that the Award was made in multiple currencies).

8.   I hereby certify that a copy of the four awards attached to this Declaration as Exhibit 2, *in globo*, constitute a true and accurate copy of the Award.

9.   The Award has become final and is no longer subject to any appeal.

10.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of April, 2021.


_____
   CHRISTOPHER GARLEY

PD.37295038.1

Original
1/2

# Time Charter

## GOVERNMENT FORM



CONTINENTAL CHARTERING
GMBH & CO. KG
20095 Hamburg
Ballindamm 17

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   This Charter Party, made and concluded in _____ 3rd day of _November_ _____ ~~19~~ _2000_
2   Between _Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC FLAMINIA", Puttbrunn_
3   Owners of the good _____ ~~Steamship/~~Motorship _MSC FLAMINIA - Hull No. 4073 of_
4   ~~of _____ tons gross register, and _____ tons net register, having engines of _____ indicated horse power~~
5   ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed _____~~
6   ~~at _____ of about _____ cubic feet bale capacity, and about _____ tons of 2240 lbs,~~
7   ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~
8   ~~allowing a minimum of fifty tons) on a draft of _____ feet _____ inches on _____ Summer freeboard, inclusive of permanent bunkers,~~
9   ~~which are of the capacity of about _____ tons of fuel, and capable of steaming, fully-laden, under good weather~~
10  ~~conditions about _____ knots on a consumption of about _____ tons of best Welsh coal-best grade fuel oil-best grade Diesel oil,~~
11  now _See Clause 39_
12  _____ and _MSC - MEDITERRANEAN SHIPPING CO, SA_ Charterers of the City of _GENEVA_
13  Witnesseth. That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about _16 years + 60 days in Charterers' option, worldwide trading_
15  _____ within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel _only with Owners' prior approval which not to be unreasonably withheld_ for all or any part of the time covered by
    this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, ~~at~~ _when where ready alongside at Daewoo Heavy Industries Co. Ltd., Okpo Shipyard, South Korea._
19  _See Clause 30_
20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery _and throughout_
    _the period of the Charter_ to be
22  ready to receive cargo with clean-swept holds _free of insects and smells to an independent surveyor's satisfaction_ and tight, staunch, strong and in every way
    fitted for the _container_ service, having water ballast, ~~winches and~~
23  ~~donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches~~ at one and the same
24  time (and with full complement of officers, seamen, engineers and ~~firemen~~-crew _trained for firework_ for a vessel of her tonnage), to be employed, in carrying
    lawful merchan-
25  ise _in ISO Containers only, ~~including petroleum or its products, in proper containers, excluding~~ See Clause 78_
26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America _____ and/or Europe~~
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32  _Vessel to be employed always within I.W.L., always afloat._
33  _____
34  _____
35  as the Charterers or their Agents shall direct, on the following conditions:
36     1. That the Owners shall provide and pay for all provisions, wages _and immigration fees_ and consular shipping and discharging fees of the
       Crew;shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including ~~boiler water~~ _lubricating oil_ and maintain her class and
    keep
38  the vessel in a thoroughly efficient state in hull, _and holds_ machinery and equipment for and during the service.
39     2. That _whilst on hire_ the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions
    _other than husbandry commission,_
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

EXHIBIT 1

NSB 6083

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account ~~after vessel has been on charter for a continuous period~~

44  ~~of six months or more.~~

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo,~~but~~

46  ~~Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards~~

47  ~~for dunnage, they making good any damage thereto.~~

48  3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than _____ tons and not more then~~

50  ~~_____ tons and to be re-delivered with not less than _____ tons and not more than _____ tons.~~ See Clause 37

51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *EURO 12.975,- and USD 15.275,- per day pro rata including*

52  *overtime (from the time of delivery* United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53  ~~stores, on _____ summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at~~

54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) at *1 safe port within Singapore / Japan range or Skaw / Passero range in Charterer's option.*

    ~~unless otherwise mutually agreed.~~ Charterers are to give Owners not less than *120/90/60/30/20/15/10/5/3/1* day

    *approximate*

57  notice of vessels expected date of re-delivery, *range* and probable port.

58  5. Payment of said hire to be made *in Hamburgin* New York in cash in United States Currency, *15 days* ~~semi-monthly~~ in advance, and for the last

    'half month or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat  at any time .~~_____~~

    ~~to aground.~~

    7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~_____~~

74  ~~paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew ~~and~~

77  ~~boats.~~ The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, ~~and~~ trim *discharge, tally, dunnage, lash and unlash* the cargo at their expense under the supervision of the Captain,

    who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments, *but this provision does not affect Charterers*

    *right to advance any claims to require arbitration under Cl. 17 of any dispute regarding the Master in the prosecution of his voyages and in carrying out*

    *the orders and directions of Charterers.*

This is a computer generated NYPE 46 form.  Any insertion or deletion to the form must be clearly visible.  In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply.  Dataworks assumes no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

NSB 6084



82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of US$ 15,– per day $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual
    Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying *for breakfast USD 3,50 per person, for lunch and dinner respectively Charterers to pay USD 4,50 per*
    *person. The amount to be reviewed every 4 years. Owners in no way whatsoever to be responsible for Supercargo.* at the current rate per meal, for all such
    victualling.
86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13. That the Charterers shall have the option of continuing this charter for a further period of _____
92  _____
    on giving written notice thereof to the Owners or their Agents _____
 5  14. That if required by Charterers, time not to commence before _____ and should vessel
95  not have given written notice of readiness on or before _____ but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  ⑮ That in the event of the loss of time from deficiency *and/or default of men including strikes of Officer and Crew whether due to labour disputes*
    *or otherwise or deficiency* of men or stores, fire, breakdown or damages to hull, *holds* machinery or equipment, *unless caused by Charterers and/or*
    *Charterers servants,*
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *reasonable* extra expenses shall be deducted from the hire *unless caused by Charterers and/or Charterers servants,*
102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London – English*
    *Law to apply* New York,
 08 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping* commercial men.
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and all sub hires* for any amounts due under this Charter, including
    General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
    Crew's proportion. General Average shall be adjusted, stated _____ Rules 1 to 15, inclusive, 17 to 23, inclusive, and Rule F of
115 and settled, according to
116 York-Antwerp Rules 1974/4 and subsequent amendments, if any, in London._____
    and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepencies between the original approved document and this form.

NSB 6085

120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money.

126    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever
127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131 ships belonged to strangers. Hire not to contribute to general average.

132    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133    20. Fuel used by the vessel while off hire , also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
    cost of replacing same, to be allowed by Owners to be for Owners account.

135    21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138 _____
139 _____

140    22. Owners shall maintain the gear of the ship so fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141 providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel electric lights on deck and in holds lanterns and oil for
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel. Charterers have the use of vessel's lashing material as onboard.

145    23. Vessel to work night and day and on Sundays and on holidays, if required by Charterers, and all winches to be at Charterers' disposal during
    loading and discharging:
146 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
   insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required; and pay any loss of time occasioned
   thereby.

151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder:

155                      U. S. A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160                      Both-to-Blame Collision Clause
161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her owners in so far as such loss

This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Ostworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

164    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-

165    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non- carrying ship or her

166    owners as part of their claim against the carrying ship or carrier.

167        25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging.

170        26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172    ~~27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to~~

173

174 ~~on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.~~

175    ~~28. An address commission of 3 1/2 per cent payable to~~ *the Charterers* _____ ~~on the hire earned and paid under this Charter.~~


*THE OWNERS:*

CONTI 11. Reefertes Schiffarts-GmbH & Co. KG
M/S "MSC Flaminia"
Werner-, v.-Stemen-Str. 15 · 95340 Puraburna
Tel. 0 89 / 45-63-50-0 · Fax 0 89 / 45 63 50-55


*THE CHARTERERS:*


This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Oatworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

# CONTINENTAL CHARTERING GMBH & CO. KG

Original
$\Lambda/2$

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

#### Clause 29
Vessel to be delivered with Charterers' name, logo and funnel. Charterers' to reinstate to Owners' name, logo and funnel at Charterers' time and expense prior redelivery.

#### Clause 30
The vessel to be delivered to the Charterers at the time it has actually been delivered to the Owners in accordance with the terms and conditions of the building contract and agreed / known by / to the Charterers.

The Charterers are obligated to take delivery of the vessel as long as the Owners are obligated to accept delivery under the building contract and furthermore the vessel shall be accepted by the Charterers in the state and condition the Owners have the obligation to accept the vessel pursuant to the terms of the building contract. Any relevant penalty as agreed in the building contract for deficiencies in the performance of the vessel shall be transferred to the Charterers, except penalties for late delivery of the vessel, if any.

Delivery as follows:
Contract 31st August 2001          /          yard target delivery 9th August 2001

Owners to tender 90/60/30/20/10/5 days approximate and 3/2/1 days definite notice of delivery to the Charterers. Notices to be tendered to MSC, Geneva, Fax: 0041-22-7038787 or via Telex: 427445 MSC CH.

#### Clause 31
The Master shall supervise the stowage of the cargo thoroughly and let one of his Officers control all loading, handling, stowage, lashing and discharge of the cargo.

#### Clause 32
The Owners guarantee that the vessel is fully covered for the trade by and shall remain entered in a P &I Association for the duration of this Charter Party.
Owners' P&I Club is: The Swedish Club
Owners and Charterers have the right to change the vessel's P+I Club during the currency of this Charter Party. Same to be advised well in advance to the Charterers. Charterers to have P+I cover for their purposes, Charterers' P+I Club is : The Standard Club

#### Clause 33
Deleted.

#### Clause 34
The Owners to give Charterers 3 working days written notice, excluding Sundays and holidays, before exercising their rights under this contract for non-paid hire. (See Clause 5) The Charterers may deduct the estimated expenses incurred by them for Owners' account for which, however, vouchers have not yet reached them for submission to Owners, as well as from last hire payments the value of bunkers estimated to be on board on redelivery.

NSB 6088

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

#### Clause 35

Notwithstanding anything in this Charter Party to the contrary, it is expressly agreed that the Owners remain responsible for and agree to indemnify Charterers against all personal injury and loss of life claims unless caused by Charterers and/or their servants. In the event that the vessel/her cargo or part thereof, containers, bunkers or stores is arrested and/or seized through a competent court or tribunal in respect of any claim and/or a lien whether maritime or otherwise is exercised against the vessel/her cargo or part thereof, containers, bunkers or stores preventing the vessel from sailing and/or detaining/delaying the vessel in any way whatsoever not arising through any claim against the Charterers, the vessel shall be off-hire from the time of arrest/seizure/the lien is exercised until the arrest/seizure/lien is lifted (whether or not such arrest, seizure or lien was justified or not) and Charterers shall be reimbursed for any reasonable expenditure which they may incur under this Charter during the off hire period, always unless caused by Charterers and/or their servants.

#### Clause 36

The Owners guarantee that the vessel is always safe in ballast without any solid ballast being required.

#### Clause 37

Owners will advise with the 10 days approximate notice the approximate quantities of bunkers on board upon delivery. Vessel to be redelivered with sufficient bunkers onboard to reach the next main bunkering port. Prices both ends to be as per Platts' Oil Grame nearest port at the respective day of delivery / redelivery.

On delivery the Charterers to take over the bunkers and pay same together with first hire payment. Charterers shall supply suitable fuels to enable main propulsion and auxiliary machinery to operate efficiently and without harmful affects, according to the vessel's description (see Clause 39). The fuel oil supplied to be in accordance with ISO 8217: 1997 RMG 35 for fuel and ISO 8217: 1997 DMB for MDO.'

#### Clause 38

Charterers will not be responsible for damage done to the vessel unless the Master at time of occurrence advises the Charterers of such damage for which Charterers may be responsible. Such damage must be duly substantiated by the Master's prompt notice of damage claimed, delivered in writing upon the party responsible and Master is to endeavour to obtain written acknowledgement thereof. A copy of such notice together with the reply received, if any, to be sent immediately to :

MSC – Mediterranean Shipping Company S.A.,
Attention of Mr. C. A. Girardet, 40, Avenue  Eugene Pittard, 1206 Geneva, Switzerland, Telephone (022) 7038888, Telex 427445 but latest on completion of respective cargo voyage.

Hidden damages to be reported as soon as discovered, but latest at the end of each roundvoyage. Damage affecting the seaworthiness and/or cargoworthiness to be repaired immediately after occurrence.'

---

NSB 6089

# CONTINENTAL CHARTERING GMBH & CO. KG

Additional Clauses No. 29 - 111
*to the Charter Party*
M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 39
Description as per contract/builders specification, which is known by/to the Charterers. Owners' managers to issue 2 weeks prior delivery vessel's full T/C description which to be incorporated as addendum to this Charter Contract.

Clause 40
Master to supply Charterers with full voyage report in English as well as Log extracts. A voyage report should be despatched as soon as practically possible, but in no case later than one month after the end of each voyage to:
MSC MEDITERRANEAN SHIPPING COMPANY S.A., Attention Mr. C.A. Girardet
40, Avenue Eugène Pittard, 1206 Geneva, Switzerland.

Clause 41
Deleted.

Clause 42
Charterers and their supercargo have the right of using vessel's wireless station at cost as per tariff.

Clause 43
The Master has to keep a record of all Charterers' gear, equipment and/or stores supplied to the vessel and to maintain same in good order and condition. Such gear, equipment and/or stores to be redelivered to the Charterers prior to vessel's redelivery to Owners, or, if requested by Charterers, at any time during the period of this Charter in like good order and condition as supplied (ordinary wear and tear excepted).

Clause 44
Owners agree to instruct crew that it is prohibited to vessel's crew to carry any illegal merchandise on board. Any illegal merchandise carried against the prohibition for barter or for sale purposes will be lost to the vessel. Any custom's fines imposed on the vessel to be for Owners' account and any time lost thereby to be for Owners' account and to be deducted from next hire payment. In the event that contraband and / or unmanifested goods are found to have been shipped as part of the containers and / or in containers on board, any fines, taxes or imposts levied shall be for the Charterers' account, and the vessel shall remain on hire during any time lost as a result thereof. In this event any security required shall be provided by the Charterers, unless it can be established that the Master, officers and / or crew are involved in smuggling.

Clause 45
Timecharter hire to include, if so allowed by local regulations and Master's prior approval and crew to be seen as Charterers' servants only, rendering customary assistance by the crew:

a) shifting operations and docking;
b) bunkering;

NSB 6090

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

c)  maintaining power while loading and/or discharging
d)  supervision of loading and/or discharging;

#### Clause 46
Vaccinations for Crew always to be for Owners' account.

#### Clause 47
On delivery/redelivery joint on-hire/off-hire survey to take place and expenses reasonably incurred to be equally divided between Owners and Charterers.

#### Clause 48
Charterers not to be responsible for loss and/ or damage sustained by the vessel or for liability for or at the payment of any expense, loss and damages whatsoever, arising through the acts or omissions of pilots, tugboats, linesmen or fuel suppliers, who are to be paid by the Charterers but shall be deemed to be the servants of the Master and under his instructions.

#### Clause 49
Charterers have the right to load on deck and hatches subject to Master's discretion vis-à-vis safety/stability and visibility.

#### Clause 50
Owners to supply valid deratting certificate on delivery of the vessel and if this does not cover the whole period of timecharter and fumigation is necessary, cost of such certificate to be for Owners' account.

#### Clause 51
Owners and Charterers to discuss from case to case any extension of time limits.

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the latest NYPE Interclub New York Exchange Agreement, and latest amendments thereto.

#### Clause 52
Should the vessel put back whilst on voyage by reasons not within Charterers' liability, the hire shall be suspended from the time of her putting back until she is again in the same position or equivalent and the voyage resumed therefrom. In the event of loss of time either in port or at the sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel or by reason of the refusal of the Master or crew to perform their duties, Charterers' servants excepted, the time so lost and any extra fuel consumed and any extra expenses incurred shall be for Owners' account. Other than to save life or property, however should the vessel reasonably alter course to avoid bad weather or be driven into port or anchorage by stress of weather, the vessel shall remain onhire and all costs thereby incurred shall be for Charterers account.

NSB 6091

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 53
Charterers have the right at any time during the course of this Charter Party to arrange for a bunker sounding in order to check on their property, including opening of the manhole covers.

Clause 54
Deleted.

Clause 55
Charterers have the right to tranship any or all of the cargo on board the vessel at any time or place into other vessel(s) employed within the framework of Charterers' Liner Service. These operations to be under Charterers' liability. Owners and vessel not to be responsible for any expenses and/or claims resulting from damages to and/or shortages etc. of containers and/or cargo if through - or house-to-house bills of lading are signed, if same occur after actual discharging or prior to loading of containers and/or cargo from/on this vessel. Charterers to keep Owners harmless for any such expenses and/or consequences and /or claims.

Clause 56
Deleted.

Clause 57
In the event of loss of time due to boycott or otherwise of the vessel by labour or authorities or due to government restrictions caused by the vessel's crew or by reason of the terms and conditions under which the members of the crew are employed (inter alia crew's employment is to be covered by a bona fide Trade Union agreement which is acceptable to the ITF under this Charter. Owners must warrant that the vessel has corresponding certificate on board) or by reason of any trading of this or any other vessel under same ownership, operation or control, hire to cease from the time of the vessel being delayed and any time/cost in this connection to be deducted and  the Owners shall reimburse Charterers any expense caused thereby and Owners immediately have to refund hire paid in advance. If within 96 working hours Owners have been unable to remedy the loss of time as above the Charterers shall have the option to cancel the Charter Party.

Clause 58
Deleted.

Clause 59
Commercial Owners:
Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC FLAMINIA", Putzbrunn
c/o Conti Reederei Management GmbH
Wernher-von-Braun-Str. 10
85640 Putzbrunn

Tel.:        +49-89-45 65 55 00
Fax:        +49-89-45 65 50 55

NSB 6092

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Email :     schiff@conti-online.de

Technical managers:
NSB Niederelbe Schiffahrtsgesellschaft GmbH & Co. KG
Harburger Str. 4
21614 Buxtehude

Tel.:       +49-4161-645-0
Fax:        +49-4161-626 88
Email:      tis@reederei-nsb.com

Clause 60

Hire to be paid to Owners' account with:

Hamburgische Landesbank, Hamburg
Account No.: 601377/004
Swift Code:  HALA DE HH.
In favour of: Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC FLAMINIA"
Reference:   M/V MSC FLAMINIA / C/P 03.11.2000 / MSC

Clause 61
Owners shall indemnify Charterers for personal accidents or injuries sustained by any person
on board the vessel as far as P&I rules permit. Owners have to maintain full P&I Cover in this
respect.

Clause 62
Notwithstanding to anything stipulated in this contract to the contrary Owners are responsible
for and shall keep Charterers free from all insured risks. Owners are liable to keep the vessel
fully insured against all hull risks as per INSTITUTE TIME CLAUSES (Hulls) including
RDC for equivalent conditions.

Clause 63
Deleted.

Clause 64
Charterers have the option to load in and/or on all hatches empty and/or full containers but in
agreement with the Master with reference to the strength of the hatches and the stability of the
vessel. The crew to daily watch the conditions of the containers carried and relash same or
tighten the lashings whenever it may become necessary. The crew also to perform regular
inspection of reefer containers and ensure proper condition, all weather permitting and as far
as possible.

NSB 6093

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 65
The Owners have to establish or maintain financial security or responsibility in respect of oil or other pollution damage and to provide and furnish any certificates to authorities to enable the vessel lawfully to enter, remain in, or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party. Should any delay to the vessel or any extension to the voyage occur from failure to comply with the above or any other rules, regulations, oil pollution or other pollution legislation, the vessel to be considered off-hire for the period of such delay. The Owners hereby accept responsibilities for all the consequences and agree to indemnify the Charterers against all claims, liabilities and cost (including Charterers' legal fees) which result from the Owners' failure to comply fully with the above.

Clause 66
The Master, Charterers and/or their agents are hereby authorized by Owners to sign on Master's and/or Owners' behalf Bills of Lading as presented strictly in conformity with Mate's and/or Tally Clerk's Receipts without prejudice to this Charter Party. Bills of Lading so issued contain undermentioned Demise Clause:

'If the ship is not owned by or chartered by demise to the Company or Line by whom this Bill of Lading is issued (as may be the case notwithstanding anything that appears to the contrary) Bills of Lading shall take effect only as a contract with the Owners or Demise Charterers as the case may be as Principal made through the Agency of said Company or Line who act as Agents only and shall be under no personal liability whatsoever in respect thereof.'

In consideration of which the Charterers agrees to indemnify the Owners in respect of any cargo claims which under the terms of this Charter Party are the liability of the Charterers, but not exceeding the limits of liability provided under the Merchant Shipping Acts.

Clause 67
Should Charterers decide to route the vessel, Master is to consult with instructions received from the routing agency and in particular to send position etc., as requested.

Clause 68
Deleted.

Clause 69
Owners warrant to have secured and to carry on board the vessel a U.S. Federal Maritime Commission's Certificate of financial responsibility as required under U.S. Water Quality Act of 1970, or similar certificates of other countries. In no case shall Charterers be liable for any damages as a result of Owners' failure to obtain the aforementioned certificate.

Clause 70
It is understood that, if necessary, the vessel will comply with any safety regulations and/or requirements in effect at ports of loading and/or discharging. Particularly with the United

NSB 6094

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

States Department of Labour Safety and Health Regulations established by U.S. Public Law 85-742, Part 9 (Safety and Health Regulations for Longshoring).

Although other provisions of the Time Charter make it the responsibility of the Time Charterers, it is agreed that, should the vessel not meet the rules and regulations, Owners will take immediate corrective measures and that any stevedores' standby time and expenses involved, including off-hire, will be for Owners' account.

Clause 71

Owners shall pay for all costs of sealing the ship's stores, legalisation of Crew list, sick mariner dues, noting of Sea Protest.

Clause 72

Charterers and Owners shall be released from any liability in respect of claims Charterers or Owners might have under this Charter Party unless the relevant claim has been brought to the attention of Charterers or Owners in writing within 12 months of redelivery of the respective vessel.

Clause 73
Deleted.

Clause 74

The Owners have the option to extend this Charter Contract for the time lost during offhire, excluding requisition (Clause 83).

Clause 75

Owners expressly understand and agree that their vessel is chartered for the specific utilization in Charterers' scheduled containerised liner service (lines 16-17 of main body reserved).

Clause 76   DRYDOCKING

The Owners have the right to place the vessel in drydock during the currency of this Charter at a convenient time, period and place which to be mutually agreed upon between Owners and Charterers. The Owners shall give the Charterers a 3 (three) months prior notice when, where and how long they are intending to drydock the vessel. Drydocking and / or other repairs in case of emergency to be effected when necessary and above provisions not to apply.

Clause 77

BIMCO STANDARD ISM CLAUSE FOR TIME CHARTER PARTIES

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners' managers shall procure that both the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners managers shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

NSB 6095

# CONTINENTAL CHARTERING GMBH & CO. KG

Additional Clauses No. 29 - 111
to the Charter Party
M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the company" to comply with the ISM Code shall be for Owners' account.

## Clause 78
Except as provided in this Clause, the vessel shall be used exclusively for the carriage of goods in ISO Standard Containers complying with the International Convention of safe Containers. Uncontainerised goods may be carried only with the prior consent of Owners and Masters, provided that they are suitably prepared for carriage, at Charterers' full risk and expenses. The Owners agree that the Charterers may carry the maximum quantity of ............ (to be advised/agreed between Owners/Charterers prior delivery) mtons of hazardous goods in ISO Containers provided same are loaded, stowed, labelled, discharged and documented in accordance with IMO regulations, any mandatory local regulations and requirements of the vessel's flag state and the load, discharge and trading ports/routes of the vessel. IMO class 1+7 are always to be excluded same as arms, ammunitions (except for hunting/collection/sport purposes), chemical and toxic waste, explosives, radioactive or nuclear products except for medical use, hypo calcium chloride class 5.1 nr 1479,1748,2708 and 2880 as well as animals and livestock. Any special safety equipment required by local law or regulations to be provided and paid by the Charterers. Every dangerous/hazardous cargo/containers must be accompanied by a container packing certificate and special manifest delivered to vessel's command before loading the relevant containers/cargo. Dangerous goods not to be stowed direct on/beside heated tanks. Wet hides to be allowed in containers only, which to be loaded on deck if possible.

## Clause 79    TRADING EXCLUSIONS
The vessel shall not be obliged to force ice nor to follow icebreakers.
Always excluding Denmark, Norway, Sweden, Finland, Iceland, Faroer, Turkish occupied part of Cyprus, Israel, Libanon, Syria, Somalia, Eritrea, Yemen, Iraq, Iran, Nigeria, Cuba, Haiti, Libya including Gulf of Sidra / Sirte, Algeria, Liberia, Vietnam, Angola including Cabinda, North Korea, former Yugoslavian states / ports, Papua New Guinea, CiS, Sierra Leone and/or any war and war risk countries including territories and countries which result in blacklisting sanctions by other countries and / or United Nations. Further, vessel not to be ordered to any ports which vessel cannot enter due to her flag requirements.

## Clause 80    OWNERS' LASHING MATERIAL
Owners at delivery to supply the vessel with full set of fittings / lashing materials required for carriage of containers and to maintain same throughout the currency of this Charter Party. In the event of any loss of / or damage to fittings/lashing materials caused by negligence of Charterers, their Agents or servants, such loss of and / or damage to fittings / lashing materials to be replaced and/or repaired for Charterers' account as per Master's / vessel's statement. Fair wear and tear always to be excepted.

NSB 6096

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 81
For ordinary items, such as postage, crew change etc, Owners to use Charterers' agents at no additional agency fee. In case extraordinary service required, such as drydocking, general average Owners to appoint their own agent or to agree with and pay a additional fee to Charterers' agents.

Clause 82
Deleted.

Clause 83     REQUISITIONS
Should the vessel be requisitioned by any government or governmental authority during the period of this Charter Party, it shall be off hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be paid to the Owners.

Clause 84     SECURING OF CARGO INSIDE CONTAINERS
Securing of cargo inside containers and / or flats and / or other loads to be entirely Charterers' concern and responsibility. Owners shall in no case be responsible for claims / damages and consequences whatsoever arising from bad and / or insufficient stowage inside the containers and/or other loads. Damages, if any, shall be repaired by Charterers at their time and expense.

Clause 85
Deleted.

Clause 86
All taxes and dues on the vessel and /or cargo and on freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account. Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514 (also referred to as the U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attribute to transportation under this Charter Party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. Source Transportations Gross Income, shall be reimbursed by Charterers.

Clause 87     CONTAINER WEIGHTS
Charterers or their agents to furnish Master with Shippers' declared weights for containers prior loading. Charterers to be fully responsible for any consequences, delays and expenses as may arise in port or at least from lack of container weights and / or discrepancies between manifests and actual container weights.

Clause 88
(A) 'In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the vessel.

NSB 6097

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Non-compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the vessel harmless and shall keep them indemnified against all claims, whatsoever, which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for Charterers' account and the vessel shall remain on-hire. Should the vessel be arrested as a result of Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the vessel is released and at their expense put up bail to secure release of the vessel without putting the vessel offhire.

(B) In pursuance of the provisions of sub clause (A), the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the vessel under this Charter whichever is earlier, and will so remain during the currency of the Charter Party.'

Clause 89     HAMBURG RULES
Neither the Charterers nor their Agents shall permit the issue of any Bills of Lading or Waybills, whether or not signed on their behalf or on behalf of the Owners, incorporating the Hamburg Rules or any legislation under which the Hamburg Rules are compulsorily applicable in respect of any contract of carriage under or during the period of this Charter or any sub-Charter. In the event that the Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where those rules were not compulsorily applicable and where the Owners would not otherwise have sustained a liability then the Charterers shall indemnify the Owners for all loss and damage sustained thereby.

Should the Charterers direct the vessel to countries where the Hamburg Rules are compulsorily applicable or otherwise cause the contracts of carriage under Bills of Lading or Waybills to be subject to the Hamburg Rules and should the Owners thereby sustain a liability, then the Charterers shall indemnify the Owners for all loss and damage in excess of the loss and damage which the Owners would have sustained if the Hague or Hague Visby Rules had applied.'

Clause 90     BIMCO STOWAWAY CLAUSE
            A)    (1)     The Charterers warrant to exercise due care and diligence in
                          preventing stowaways in gaining access to the vessel by means
                          of secreting away in the goods and / or containers shipped by the
                          Charterers.

            A)    (2)     If, despite the exercise of due care and diligence by the
                          Charterers, stowaways have gained access to the vessel by
                          means of secreting away in the goods and / or containers
                          shipped by the Charterers, this shall amount to breach of Charter

NSB 6098

# CONTINENTAL CHARTERING GMBH & CO. KG

Additional Clauses No. 29 - 111
to the Charter Party
M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

A)   (3)   Should the vessel be arrested as a result of the Charterers' breach of Charter according to sub-Clause (A) (2) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel, without putting her offhire.

B)   (1)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and / or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for Owners' account and the vessel shall be off hire.

B)   (2)   Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and / or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

Clause 91   US TRADE UNIQUE BILL OF LADING IDENTIFIER CLAUSE
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the USA shall have been endorsed with an Unique Bill of Lading Identifier as required by the US Customs Regulations (19 CRF part 4 section 4. 7a) including subsequent changes, amendments or modifications thereto, not later than the first port of call. Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.
Furthermore all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

Clause 92
Export and/or import permits for cargo to be at Charterers' risk and expense. Charterers to obtain and be responsible for all necessary permits to enter and/or trade in and out of all ports during the currency of this Charter at their own risk and expense. Taxation or levies on cargo whatsoever for these purposes to be for Charterers' account and to be paid by Charterers.

NSB 6099

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Charterers to remain responsible to arrange for Standard Carrier Alpha Code (SCAC) provided same is required by trade and compulsory whilst trading with USA.

Clause 93
Deleted.

Clause 94     PROTECTIVE CLAUSES
This Charter Party is subject to the following clauses all of which are also to be included in all Bills of Lading or Waybills issued hereunder:

(A)   Clause Paramount
This Bill of Lading shall have effect subject to the provisions of the carriage of goods by sea act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue or origin or destination of the Bills of Lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its right or immunities or an increase of any of its responsibility or liabilities under said applicable act. If any term of this Bill of Lading be repugnant to said applicable act to any extent, such term shall be void to that extent, but no further.

and

(B)   Both-to-Blame Collision Clause
If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other non-carrying ship or her insofar as such loss or liability represents loss of, or damage, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other non-carrying ship or her Owners as a part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

and

13 / 18

NSB 6100

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

(C)   New Jason Clause

In the event of accident, danger, damage, or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible, by statue, contract, or otherwise, the goods, Shippers, Consignees, or Owners of the goods shall contribute with the Carrier in General Average to the payment of any sacrifices, losses, or expense of a general average nature that may be made or incurred, and shall pay salvage and specials charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery.

and

(D) · CONWARTIME 1993

(1) For the purpose of this Clause, the words:

(a) „Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel, and the master, and

(b) „War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual reported), acts of piracy, acts of terrorist, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2)The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

---



NSB 6101

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

(3)The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed on all vessels, or is imposed selectively in any way whatsoever, against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)

(a)The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(b)If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time the next payment of hire is due.

(5)If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)The vessel shall have liberty:

(a)to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, port of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
(b)to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(c)to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.
(d)to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;



NSB 6102

# CONTINENTAL CHARTERING GMBH & CO. KG

Additional Clauses No. 29 - 111
to the Charter Party
M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

(e)to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.

No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8)If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

Clause 95
Deleted.

Clause 96    (reflagging)
The Owners have the option to reflag the vessel during the currency of this Charter, subject to Charterers' prior approval, which not to be unreasonably withheld.

Clause 97    (gangway watchman)
Compulsory gangway watchmen always to be for Charterers' account.

Clause 98
Deleted.

Clause 99
Deleted.

Clause 100
Compulsory charges for garbage removal when no actual disposal of garbage, then to be for Charterers' account. Sludge removal to be for Owners' account.

Clause 101    Grace period
The Charterers will allow Owners a grace period of 15 accumulated hours per month for maintenance and repair works. Owners will advise and coordinate with the Charterers well in advance, when and where such work will be / to be carried out, emergency repairs always excepted.

NSB 6103

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 102
Deleted.

Clause 103    Reefer container
Master immediately to notify Charterers and/or their agents in case of malfunction and to render any physically possible assistance with vessel's engineers in repairing malfunctioning containers whilst en route in order to maintain the temperature at the required levels provided spare parts are available on board the vessel. Charterers will supply repair kits and spare parts. Vessel's crew to be considered as Charterers' servants. Charterers are to furnish the vessel's command prior loading of reefer Containers a list showing the temperatures of each loaded reefer container. Charterers to pay to the Owners USD 10,- per man/hour for repair works, such amount to be reviewed every 4 (four) years and mutually agreed by Owners and Charterers. Master's statement to be taken as the binding evidence. Charterers to have the option to load independently generated power pack(s) at their full time, risk, responsibility supervision and expenses.

Clause 104
Deleted.

Clause 105
Deleted.

Clause 106
During bunkering, representative samples to be taken at vessel's bunker manifold and such samples to be sealed by the supplier in presence of Owners' Agents/Representatives. Claims regarding quality of new bunkers to be made within the first ten days after bunkering. Bunkering in any case to be made into empty tanks and no mixing of bunkers allowed as far as technical possible.

Clause 107
Deleted.

Clause 108
Deleted.

Clause 109
Deleted.

Clause 110
Deleted.

NSB 6104

# CONTINENTAL CHARTERING GMBH & CO. KG

### Additional Clauses No. 29 - 111
### to the Charter Party
### M/V MSC FLAMINIA dated Hamburg, 3rd November 2000

Clause 111
Should the Owners under the building contract have the right to reject delivery of the vessel, the Owners in consultation with the Charterers shall decide whether the vessel shall be rejected or not.

In case the Owners and Charterers decide not to take deliver of the vessel, this Charter contract shall be null and void. In case of the builders inability to delivery this vessel, then this Charter Contract will be null and void.

NSB 6105

**Original**
2/2

First addendum to the Charter Party of m/v

MSC FLAMINIA

Dated 3rd November 2000



It is this 8th March 2001 freely and mutually agreed between:

- Conti 11. Container Schiffahrts-GmbH & Co. KG
  MS "MSC FLAMINIA", Putzbrunn                          ("the Owners")

and:

- MSC Mediterranean Shipping Company Limited           ("the Charterers")

that:

1.
   in line 58 the words "in United States Currency, 15 days in advance" are cancelled but
   replaced by the words "in EURO- and United States currencies every 15 days in
   advance alternately in US Dollars and in Euro, 30 days volumes each".

ALL THE OTHER TERMS, CONDITIONS AND EXCEPTIONS OF THE CHARTER
PARTY DATED 3RD NOVEMBER 2000, ARE DEEMED TO REMAIN VALID AND IN
FULL FORCE.

Geneva, 21st March 2001

The Owners



CONTI 11 Container Schiffahrts-GmbH & Co. KG
MS "MSC Flaminia"
Werner-von-Braun-Str. 10 · 85640 Putzbrunn
Tel. 0 89 / 45 25 50-0 · Fax 0 89 / 45 25 50-55

The Charterers

MSC MEDITERRANEAN SHIPPING CO S.A.



**Original**
212

Second addendum to the Charter Party of m/v

**MSC FLAMINIA**

Dated 3rd November 2000



between

- Conti 11. Container Schiffahrts-GmbH & Co. KG
  MS "MSC FLAMINIA", Putzbrunn                                      ("the Owners")

and

- MSC Mediterranean Shipping Company Limited                       ("the Charterers")

In reference to Clause 60, the Owners' bank account has been changed.

Herewith we repeat the Owners' bank accounts in full:

| | | |
|---|---|---|
| **Bank** | : | **Commerzbank, Hamburg** |
| **Sort code** | : | **200 400 00** |
| **Account No. EURO** | : | **6 219 026 03/EURO** |
| **Account No. USD** | : | **6 219 026 03/USD (Via Commerzbank, New York)** |
| **Swift Code** | : | **COBAUSXXX** |
| **In favour of** | : | **Conti 11. Container Schiffahrts-GmbH & Co. KG** |
| | | **MS "MSC FLAMINIA"** |
| **Reference:** | : | **M/V MSC FLAMINIA / C/P 03.11.2000 / MSC** |

ALL THE OTHER TERMS, CONDITIONS AND EXCEPTIONS OF THE CHARTER
PARTY DATED 3RD NOVEMBER 2000, ARE DEEMED TO REMAIN VALID AND IN
FULL FORCE.

Hamburg, 14th August 2001

The Owners

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA"
Werner-von-Braun-Str. 16 · D-85640 Putzbrunn
Tel. 0 89 / 45 65 30-0 · Fax 0 89 / 45 65 30-55

MSC MEDITERRANEAN SHIPPING CO S.A.

NSB 6107

<u>Third addendum to the Charter Party of m/v</u>

## MSC FLAMINIA

<u>Dated 3rd November 2000</u>

between

    - CONTI 11. Container Schiffahrts-GmbH & Co. KG
    MS "MSC FLAMINIA", Putzbrunn        ("the Owners")

and

    - MSC Mediterranean Shipping Company Limited    ("the Charterers")

It has been agreed that the above mentioned Charter Party has been amended under the following conditions:

In reference to Clause 39, the full T/C description has to be read as follows:

TIME CHARTER DESCRIPTION

Daewoo Hull 4073

| | |
|---|---|
| Name: | MSC FLAMINIA |
| Owner: | Conti 11. Container Schiffahrts-GmbH & Co. KG MS 'MSC Flaminia' |
| Flag: | Hong Kong |
| Port of Registry: | Hong Kong |
| Call Sign: | VRXH7 |
| Vessels class: | GL +100A5E "Container Ship" + MC AUT IW |
| Type: | Full Container Carrier 6.750 TEU |
| Container Intake: | 6.732 TEU 20' x 8' x 8'6'' acc. to IMO incl. positions used for storage flats for SATs, always subject to vessels stability, trim, lashing plan, permissible stress, lash forces, visibility line and strength of deck, hatch covers and tank top. |

Intake as per cargo securing manual.

---

1 / 4

NSB 6108

Container
distribution:

|  | 20' Units | 40' Units | total TEU |
|---|---|---|---|
| Deck | 3.338 | 110 | 3.558 |
| Deck alternatively | 26 | 1.766 | 3.558 |
|  |  |  |  |
| Hold | 2.682 | 246 | 3.174 |
| Hold alternatively | 54 | 1.560 | 3.174 |
|  |  |  |  |
| Grand total | 6.020 | 356 | 6.732 |
| Grand total alternatively | 80 | 3.326 | 6.732 |

Stack load:      Tanktop          120 tons for 20' stack
                                  270 tons for 40' stack
                 Hatch cover      80 tons for 20' stack
                                  105 tons for 40' stack
                 Mooring Deck     105 tons for 40' stack

Fittings:        Cell guides in holds for 40' units,
                 20' units can be loaded up to 7 tiers but have to be topped by at least
                 one 40' unit,
                 Lashing bridges on all bays except bay # 02 and bay # 06 fwd,
                 Vessel is fitted acc. to OSHA rules with SAT's,

                 SAT's                        10.000
                 Conventional Twistlocks      2.200
                 Turnbuckles                  3.200
                 Lashing bars short           2.200
                 Lashing bars long            190
                 Stackers hold                9.400

Reefer points:   400 FEU on deck up to 2nd tier
                 avg. power supply of 6,5 kW / FEU

High Cube Units: 600 High Cube Units 9'6'' can be accommodated below deck
                 one tier in holds # 1 – # 7
                 three tiers in hold # 8.
                 on deck acc. to vessels visibility line and all other regulations

45' Units:       1.040  45' Units can be accommodated on deck
                 units to be stowed from 3rd tier on bays # 10 to bay # 66

SOLAS stability: about 5.100 TEU at 14 tons homogeneous
                 on scantling draft 14.52 m, about 4.300 tons ballast, about 8.300 tons
                 fuel and lub oil, about 350 tons potable water

Vessels dimensions:  LOA            300,00 m
                     LBP            286,00 m
                     Breadth        40,00 m
                     Draft design   12,00 m
                     Draft scantling 14,50m

NSB 6109

|                        |                                                                                                                                                  |
|------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------|
|                        | Air draft              56,20 m                                                                                                                    |
|                        | Moulded depth          24,20 m                                                                                                                    |
| Deadweight:            | about 85824 tons on scantling draft                                                                                                              |
|                        | about 61253 tons on design draft                                                                                                                 |
| Tonnage:               | International GT about      75,590                                                                                                                |
|                        | International NT about      42,233                                                                                                                |
|                        | Suez GT about              77,498                                                                                                                 |
|                        | Suez NT about              66,448                                                                                                                 |
| Main engine:           | HSD B & W 10 K 98 MC – C 57.100 kW at 104 RPM (100% MCR)                                                                                          |
| Speed:                 | at design draft 12,00 m, clean hull, even keel, BF 3, Douglas sea state 2, about 25,6 kn, at 90% MCR (51.400 kW) of main engine not exceeding 30°C seawater temperature and 45°C engine room temperature |
| Cruising Range:        | about 18.000 nm no reefer connected                                                                                                              |
| Auxiliary engine:      | Wärtsilä 4 x 2.100 kW electrical capacity                                                                                                         |
|                        | 1 x 500 kW Port / emergency generator set                                                                                                        |

**Consumption**
**Main engine:**   about 219 tons per day
at 90% MCR (51.400 kW) basis ISO conditions and LCV of 10.200 Kcal / Kg.

**Consumption**
**Auxiliaries:**

| | |
|---|---|
| Sea: | about 8 tons per day no reefer connected |
| Port: | about 10 tons per day no reefer connected |
| Marine Diesel Oil: | about 4 tons per month |

**Fuel quality:**   Main and auxiliaries engines ISO 8217 - 1996 - RMG 35
Marine diesel oil DMB ISO 8217 – 1996
furthermore the following criteria has to be met

a) total sediment max 0,1 % weight by following test

|  | VPS method | other ID methods |
|---|---|---|
| existent TSE | ISO 10307 | IP 375 |
| potential, thermally aged | ISO 10307 + IP 390 | IP 375 + IP 390 |
| potential, chemically aged | ISO 10307 + IP 390 | IP 375 + IP 390 |

b) all fuels delivered to the vessel have to be a mineral oil based product and shall not contain taroil and/or chlorine substances or chemicals

**Holds / Hatches:**   8 holds / 17 hatches
hatch # 1     12.600 mm x 15.530 mm, 2 panels
hatch # 2     12.600 mm x 25.610 mm, 3 panels
hatch # 3 – 4   12.600 mm x 30.650 mm, 3 panels
hatch # 5 – 17  12.600 mm x 35.900 mm, 3 panels

NSB 6110

Covers: independent pontoons
max weight per panel 39 tons plus lash gear

Dangerous cargo: according class certificate

Tank capacities: HFO         about    7.848 m³
                 MDO         about     354 m³
                 Ballast water  about  19.687 m³
                 Potable water  about    336 m³
                 Lub Oil     about     579 m³

Navigational /
Communication aids: Fitted with all modern nautical aids / satellite navigation / weatherchart
recorder / inmarsat system

Above is all about.

ALL THE OTHER TERMS, CONDITIONS AND EXCEPTIONS OF THE CHARTER
PARTY DATED 3RD NOVEMBER 2000, ARE DEEMED TO REMAIN VALID AND IN
FULL FORCE.

Hamburg, 14th August 2001

The Owners                                    The Charterers

CONTI H. Container Schiffahrts-GmbH & Co. KG       MSC
MS "MSC Flaminia"
Werner-von-Braun-Str. 10 · 85640 Putzbrunn
Tel. 0 89 / 45 65 50-0 · Fax 0 89 / 45 65 50-55

---

4 / 4

NSB 6111

Fourth addendum to the Charter Party of m/v

MSC FLAMINIA

Dated 3rd November 2000

between

- CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Putzbrunn                            ("the Owners")

and

- MSC Mediterranean Shipping Company Limited            ("the Charterers")

It has been agreed that the above mentioned Charter Party has been amended:

Notwithstanding what is in Clause 39 / Third Addendum, as from about the 30th May 2002 following will be amended:

| | |
|---|---|
| Flag: | German |
| Port of Registry: | Hamburg |
| Call Sign: | DHZR |

ALL THE OTHER TERMS, CONDITIONS AND EXCEPTIONS OF THE CHARTER PARTY DATED 3RD NOVEMBER 2000 AND THIRD ADDENDUM DATED 14TH AUGUST 2001, SECOND ADDENDUM DATED 14TH AUGUST 2001 AND FIRST ADDENDUM DATED 21ST MARCH 2001, ARE DEEMED TO REMAIN VALID AND IN FULL FORCE.

Hamburg, 21st May 2002

The Owners

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC Flaminia"
Werner-von-Braun-Str. 10 · 85640 Putzbrunn
Tel. 0 89/45 65 50-0 · Fax 0 89 / 45 65 50-55

MSC Mediterranean Shipping Company S.A.

1 / 1

NSB 6112



Fifth addendum to the Charter Party of m/v

## MSC FLAMINIA

Dated 3rd November 2000

between

\- Conti 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Putzbrunn                    ("the Owners")

and

\- MSC Mediterranean Shipping Company S.A., Geneva        ("the Charterers")

In reference to the First Addendum dated 21st March 2001, Second Addendum dated 14th August 2001, Third Addendum dated 14th August 2001 and Fourth Addendum dated 21st May 2002 the Charterers' name has to read as follows:

**MSC Mediterranean Shipping Company S.A.**

ALL THE OTHER TERMS, CONDITIONS AND EXCEPTIONS OF THE CHARTER PARTY DATED 3RD NOVEMBER 2000 AND FOURTH ADDENDUM DATED 21ST MAY 2002, THIRD ADDENDUM DATED 14TH AUGUST 2001, SECOND ADDENDUM DATED 14TH AUGUST 2001 AND FIRST ADDENDUM DATED 21ST MARCH 2001, ARE DEEMED TO REMAIN VALID AND IN FULL FORCE.

Hamburg, 3rd June 2003

The Owners

The Charterers

MSC MEDITERRANEAN SHIPPING CO S.A

1 / 1

NSB 6113

$\mathcal{J}\mathcal{L}$ **Original**

Hamburg, 02.05.2007

## A D D E N D U M   NO. 6
### TO CHARTER PARTY MV MSC FLAMINIA
### DATED 3rd NOVEMBER 2000

BETWEEN

Messrs. CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Munich / Germany

- as Owners -

AND

Messrs. MSC Mediterranean Shipping Company S.A., Geneva / Switzerland

- as Charterers -

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

Owners' domicile has been changed from "Putzbrunn / Germany" to "Munich / Germany" as
from 1st May 2007.

All the other terms and conditions of the Charter Party dated 3rd November 2000 and the
subsequent addenda are deemed to remain valid and in full force.

**CHARTERERS**
= = = = = = = = = = = =

MSC MEDITERRANEAN SHIPPING COMPANY CO S.A.

Signature:

**OWNERS**
= = = = = = =

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA"
Paul-Wassermann-Str. 5 · 81829 München
Tel. 0 89/45 65 50-0 · Fax 0 89/45 65 50 55
Signatory:

NSB 6114

**Original**
21
Hamburg, 02.05.2007

## A D D E N D U M   NO. 7
## TO CHARTER PARTY MV MSC FLAMINIA
## DATED 3rd NOVEMBER 2000

BETWEEN

Messrs. Conti 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Munich / Germany

- as Owners -

AND

Messrs. MSC Mediterranean Shipping Company S.A., Geneva / Switzerland

- as Charterers -

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

Owners' domicile has been changed from "Putzbrunn / Germany" to "Munich / Germany" as
from 1st May 2007.

All the other terms and conditions of the Charter Party dated 3rd November 2000 and the
subsequent addenda are deemed to remain valid and in full force.

**CHARTERERS**
= = = = = = = = = = = =



Signatory:

**OWNERS**
= = = = = = =

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA"
Paul-Wassermann-Str. 5 • 81829 München
Tel. 089 45 65 50-0 • Fax 0 89 45 65 50-55

Signatory:

NSB 6115

Munich, 07th July 2009

### ADDENDUM NO. 8
### TO CHARTER PARTY MV MSC FLAMINIA
### DATED 3rd NOVEMBER 2000

#### BETWEEN

Messrs. CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Munich / Germany

- as Owners -

#### AND

Messrs. MSC Mediterranean Shipping Company S.A., Geneva / Switzerland

- as Charterers -

It has been agreed today that the above stated Charter Party has been amended under the following terms and conditions:

Present firm period expires by 20.08.2017 24:00 hrs UTC.
Hire of present firm period EUR 12.975 plus USD 15.275 pd pr.

As from first due payment of charter hire in July 2009 for a period of 12 months hire to be reduced by USD 9.000 pd pr to EUR 12.975 plus USD 6.275 pd pr. Afterwards hire to be EUR 12.975 plus USD 15.275 pd pr inclot (original agreed rate) up to the end of present firm period.

Firm period to be extended by 24 months up to 20.08.2019.

Hire for extension firm period to be EUR 12.975 plus USD 10.775 pd pr or in case when the market rate will be higher then market rate to apply. Market rate to be determined by the time when extension starts and every 12 months.

Otherwise all the other terms, conditions etc including charterer´s purchase option after the extended firm period to be as per present c/p dated 3rd November 2000 and the addenda thereto.

CHARTERERS
= # = MSC MEDITERRANEAN SHIPPING COMPANY CO S.A.

Signatory:

OWNERS
=======

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA",
Paul Wassermann-Str. 5 • 81829 München
Tel. 0 89 / 45 65 50-0 • Fax 0 89 / 45 00 50 56
Signatory: Sedlmeir i ppa. Huber

NSB 6116

$\mathcal{2}(\mathcal{2}$  **Original**

Hamburg, 09.01.2012

### ADDENDUM NO. 9
### TO CHARTER PARTY MV MSC FLAMINIA
### DATED 3rd NOVEMBER 2000

#### BETWEEN

Messrs. Conti 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA", Munich / Germany

- as Owners -

#### AND

Messrs. MSC Mediterranean Shipping Company S.A., Geneva / Switzerland

- as Charterers -

It has been agreed today that the above mentioned Charter Party has been amended under the following conditions:

Bunker Specification

In addition to the fuels defined in the charter party and the ship's description, Charterers are allowed to supply fuel oil which shall correspond with the specification below and which shall be in all respect suitable:

ISO 8217-2010(e) RMK500 and any subsequent amendments thereto.

The higher density and viscosity of the fuel oil may lead to higher sludge and higher consumption. Charterer therefore will not claim higher fuel consumption within reasonable range in connection with change over from 380 cSt fuel to 500 cSt fuel.

In addition to the Bunker Delivery Note, Charterers shall provide the relevant Material Safety Data Sheets of the supplied fuels as requested by SOLAS Regulation VI/5-1.

All the other terms and conditions of the Charter Party dated 3rd November 2000 and the subsequent addenda are deemed to remain valid and in full force.

**CHARTERERS**
========

MSC                    COMPANY CO S.A.

Signatory:

**OWNERS**
=======

CONTI 11 Container S...
MS "M.. FLAMINIA
Paul-Wassermann-Str. 5 · 8133.. München
Tel.0.89 / 45 65 50 0 · Fax 0 89 / 45 65 50 55
Josef Sedlmeyr      Michael Huber
Signatory:

A12 Original

CONTINENTAL CHARTERING
GmbH & Co. KG

# ADDENDUM NO. 10
TO CHARTER PARTY MV MSC FLAMINIA
DATED 03rd NOVEMBER 2000

BETWEEN

Messrs. Conti 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC Flaminia", Munich / Germany

- as Owners -

AND

Messrs. MSC – Mediterranean Shipping Co. S.A., Geneva

- as Charterers -

It has been agreed that with immediate effect, Charterers are allowed to carry IMO Class 1.4S despite the exclusions in the relevant Dangerous Goods Clause 78.

Otherwise all other terms, conditions etc to be as per present c/p dated 03.11.2000 and subsequent addenda thereto.

Munich, 12th March 2012

CHARTERERS
= = = = = = = = = = = =

OWNERS
= = = = = = =

Signatory:

Signatory:

2nd Original

ADDENDUM NO. 11
To the T/C C/P MV "MSC FLAMINIA" dated 03rd November 2000

It has been mutually agreed between

Messrs. Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC Flaminia", Munich/Germany

as Owners

and

MSC Mediterranean Shipping Company S.A., Geneva

as Charterers

that the following Low Load Operation and Ultra Low Load Operation of the Main Engine will apply on MV "MSC Flaminia".

Introduction:

In order to enable the charterers to gain advantage of a higher flexibility and bunker cost savings by operating the vessel in Slow Steaming and Ultra Slow Steaming mode, charterers and owners entered into an agreement at the terms stated here below and this addendum provides specific information as well as mandatory guidelines and parameters for the operation of main engines at a load-level below approx. 50% MCR.

Whereas the main engine of the vessel is generally designed to be operated between 50% and 90% MCR, thorough testing showed that under conditions specified in this addendum, engines can be operated at Low- and even Ultra Low Load-levels for a certain period of time, always provided that in the discretion of the master same can be performed without harmful effects and in a safe and economical operation.

The owners will instruct the master, at the master's final discretion, to take into consideration and ensure, as far as possible, that the vessel is being maneuvered and voyages are planned with the aim of achieving the most optimal economic use of the vessel, main engine and auxiliary engines in order to ensure an optimal consumption.

Speed instructions given to the vessel's master are imposed by the vessel's sailing plan that the master receives from charterer's responsible vessel operator. Such a speed instruction is to be read from the given preferred ETA (Expected Time of Arrival) at the port or location of destination. It is up to the master's discretion to decide the preferable and optimal sailing distance, with priority to be given to the safe navigation of the vessel.

Charterers will ensure that their Operations Centers are aware of and will adhere to the above paragraph in relation to the above stated master's discretion.

## 1. Definitions:

### 1.1 Low Load Operation / Slow Steaming

Any main engine operation below 1,0 bar scavenge air pressure, but above the cut in point of the auxiliary blowers (approx. 40 to 50% MCR). The operation of a main engine at this level is subject to the preconditions under 2.1.

### 1.2 Ultra Low Load Operation / Ultra Slow Steaming

Any main engine operation below that in point of the auxiliary blowers, down to 10% MCR (approx. 10%, respectively 20% if fuel sulphur content is below 2%, to 30% MCR). The operation of a main engine at this level is subject to the preconditions under both 2.1 and 2.2 below.

## 2. Preconditions:

### 2.1 Low Load Operation / Slow Steaming

The operation of a main engine at Low Load is strictly subject to the following preconditions and to the compliance with recommendations contained in MAN B&W Service Letter SLDB-511or Wärtsilä Service letter RTA82.

2.1.1 A written permission for Slow Steaming Operation must have been received by the vessel from Reederei NSB

2.1.2 During running in programs of rings, crowns or liners no Slow Steaming shall take place.

2.1.3 No Slow Steaming Operation shall take place if the sulphur content of the fuel is below 0,5% (m/m).

2.1.4 After a maximum of 3 consecutive days of Slow Steaming the load of the engine shall be gradually increased to a load of min 75% MCR (or to such level as deemed necessary by the vessel's command) for a minimum total period of 2,5 hours in order to achieve a suitable cleaning of the ancillary equipment, especially turbochargers and exhaust boiler. Such increase as the well as subsequent decrease of the engine load must be executed in small steps in compliance with the applicable service letter and shall take a minimum of 2,5 hours each.

2.1.5 During the increase or decrease of the load all engine parameters are to be carefully monitored, checked and evaluated. The drainages from piston buffer spaces and the scavenge air receiver are to be checked when engine is at high load.

2.1.6 To ensure that the auxiliary blowers are not operated in inching function it has to be ensured that the M/E is operated well above the auxiliary blower switching point (40%MCR and above).

2.1.7 To ensure best possible atomization of the fuel in the combustion space the viscosity at the inlet of the engine should be kept at the lowest possible range of 13 to 14 cSt, but the inlet temperature of the fuel must not exceed 150°C.

2.1.8 The fuel pumps, valves and nozzles must be kept well maintained and in good working condition.

2.1.9 Surging of the turbochargers must be avoided under any circumstances and if necessary the engine load is to be gradually adjusted until surging stops.

2.1.10 Excessive vibrations, critical revolutions, hammering of non-return flaps and any

<sup></sup>

2nd Original

unsmooth running of the engine is to be avoided. If necessary the engine load is to be gradually increased until smooth running condition is achieved.

2.1.11 To avoid thermal overload of exposed engine components, the limits given for:

- Exhaust gas temperature after cylinders,
- Exhaust gas temperature before turbochargers an
- Exhaust gas temperature before economizer

must not be exceeded under any circumstances. If necessary the engine load is to be re-adjusted until the limits are no longer exceeded.

2.1.12 To avoid cold corrosion of liner walls the HT-cooling water outlet temperature should be kept above 90°C but below 95°C during Slow Steaming Operations.

2.1.13 To avoid water carry over into the combustion chamber the scavenge air temperature is to be kept above the dew point. The scavenge air temperature shall be kept above 36°C and below 55°C.

2.1.14 To avoid acid fouling in the economizer an exhaust gas temperature below 180°C at the outlet of the economizer is to be avoided. If necessary the engine load is to be gradually increased until the temperature exceeds 180°C.

2.1.15 To avoid excessive fouling and possible soot fires in the economizer, frequent inspections and thorough cleaning is necessary (at least every three months). Especially at high engine loads, the differential pressure (pressure loss) over the economizer's exhaust gas ways is to be closely monitored to identify any fouling.

2.1.16 To avoid excessive fouling of the turbochargers, frequent wet- / dry cleaning on the charge air- and exhaust gas side should be performed as per the following table. The turbocharger rpm must be monitored at high loads in order to verify the effectiveness of the cleaning and to detect possible fouling.

| Engine Load | Action | Load for cleaning | Days approx. |
|---|---|---|---|
| 10 – 40 % | -Turbine dry cleaning -Exhaust Gas Boiler cleaning | 75 % | 3** |
| 40 – 100 % | -Turbine dry cleaning -Exhaust Gas Boiler cleaning | 75 % or above | * |

(Table applicable for § 2.2 Ultra Slow Steaming too)
\* Cleaning intervals as per turbo charger manual
\** Cleaning during scheduled load ups

2.1.17 More frequent cylinder-, piston underside- and scavenge air receiver inspections are to be performed. After an accumulated Slow Steaming operation period in excess of 7 days, a thorough inspection is to be carried out in the next port of call. In all other cases a thorough inspection is to be carried out at least twice per month.

2.1.18 During Slow Steaming Operations, the rotation of the exhaust valves is to be checked daily. If the rotation of the valves ceases, the load up program to be advanced to retrieve valve rotations within normal values (in average about 1to 2 revolutions per minute).

2.2    Ultra low load Operation / Ultra Slow Steaming

The operation at Ultra Low Load is only permissible for MAN B&W engines with Slide Valves and an Alpha Lubrication System installed. However, it has to be noted that during Ultra Low Load Operations below 40% MCR the recommended specific cylinder oil

feed rate [g/kWh] will be exceeded by far, and therefore a main engine shall be operated at Ultra Low Load for a limited time only.

The operation of a main engine at Ultra Low Load is strictly subject to the preconditions for Low Load Operations as per 2.1, to the following preconditions and to the compliance with recommendations contained in MAN B&W Service Letter SL09-511 or Wartsila Service Letters RTA82 and RTA79-2.

2.2.1 At least one complete set of auxiliary blower spares and one blower electric motor has to be supplied by charterer and readily available as spare onboard.

2.2.2 No Ultra Slow Steaming Operation shall take place if the sulphur content of the fuel is below 0,5% (m/m).

2.2.3 Ultra Slow Steaming Operation with fuels of a sulphur content below 2,0% (m/m) is only permissible if the min. load is limited to 20% MCR and cylinder oil is changed to a lower TBN (e.g. BN 40 or 50). Such lube oils to be supplied by owners.

2.2.4 After a maximum of 3 consecutive days of Ultra Slow Steaming, the load of the engine shall be gradually increased to a load of min 75% MCR (or to such level as deemed necessary by the vessel's command) for a minimum total period of 10 hours in order to achieve a suitable cleaning of the ancillary equipment, especially turbochargers and exhaust boiler. Such increase as well as the subsequent decrease of the engine load must be executed in small steps in compliance with the applicable service letter, and engine maker recommendations and NSB Standing Order, taking a minimum of 2,5 hours each.

2.2.5 During the increase / decrease of the load all engine parameters are to be carefully monitored, checked and evaluated. The drainages from piston buffer spaces and the scavenge air receiver are to be checked when the engine is at high load.

2.2.6 To ensure that the auxiliary blowers are not operated in inching function, it has to be ensured that the max. scavenge air pressure is about 0,1 bar below the cut out point of the auxiliary blowers, or that those are switched manually into operation. In any case it needs to be ensured, that:

- The nominal electric current of the blower motors is not exceeded,
- The motors do not overheat,
- The bearings are adequately lubricated,
- The non-return flaps in the scavenge air receiver do not clatter,
- The turbochargers do not start surging.

2.3    Excluded MCR range

2.3.1 It has to be noted that due to an imminent lack of combustion air the operation of the main engine at a load-level in the range from approx. 30 to 40 % MCR is not possible under above conditions and have to be avoided.

2.3.2 All Low Load Operations carried out on the vessel are subject to further advice, clarification or instructions by the owners which will also be forwarded to charterers.

2.4    Other Conditions

2.4.1 Charterers are to allow time for the necessary additional cleaning of M/E scavenge air space and exhaust gas boiler, and owners will endeavor to perform cleaning or any additional work (due to slow and / or super slow steaming) without interrupting charterers schedule. In any case the vessel to remain on-hire at all times.

2.4.2 deleted

2.4.3 In the event of harmful effects on the main engine or any other parts of vessels machinery or should the engine operation as defined in 2.1.4 and 2.2.4 not be sufficient to

2nd Original

entirely protect the engine and it's ancillary equipment from adverse effects caused by Slow- or Ultra-Slow Steaming, or if owners have reason to believe that the operation of the engines as described above has a detrimental effect on the vessels propulsion and associated systems, owners have the right to terminate the Slow- or Ultra-Slow Steaming operation at any time and with immediate effect.

In the event of termination of Slow- or Ultra-Slow Steaming operation, an intermediate inspection is to be carried out by a mutually agreed independent engine specialist with the OEM's (engine manufacturers') at the next possible port to verify the reasonability and justification of the termination.

2.4.4 It is acknowledged by charterers that Low Load respectively Ultra Low Load operation requires more frequent inspection and wet-/ dry cleaning of turbo chargers (ref 2.1.16), the vessels exhaust system (ref 2.1.17) and will result in more wear and tear of auxiliary blowers requiring the owners to keep additional spares onboard (ref 2.2.1).

2.4.5 In case any of the under 2.2.1. mentioned spares have been used as replacement, Ultra Low Load Operation will be suspended until the used spare part is replenished. The costs of replacement of spare parts supplied by owners, including costs of transport and installation / fitting to be borne by charterers.

2.4.6 If charterers order the vessel to proceed Ultra Low Load, while the vessel is not equipped with a full and complete set of necessary spare parts (as mentioned under 2.2.1.) the performance of Ultra Low Load Operation shall be suspended until the time the spare parts have been delivered on board.

2.4.7 Should, as a consequence of the Low Load respectively Ultra Low Load Operation, the vessel not be able to follow charterers speed orders, owners to inform charterers as soon as possible about such situation as well as the expected consequences, necessities and duration of such inability. At the same time charterers undertake not to make any speed/consumption or other performance claims for such period.

All the other terms, conditions and exceptions of the Charter Party MV MSC Flaminia dated 03rd November 2000 are deemed to remain unaltered and in full force.

Buxtehude 02.04.2012

For and on behalf of
Messrs. Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC Flaminia", Munich/Germany

CONTI 11. Container Schiffahrts-GmbH & Co. KG
MS "MSC FLAMINIA"
Paul-Wassermann-Str. 5 • 81829 München
Tel. 0 89/45 05 500 • Fax 0 89 / 45 05 50 55

For and on behalf of
MSC- Mediterranean Shipping Co. S.A

MSC MEDITERRANEAN SHIPPING COMPANY CO S.A.
Name:
Title:

NSB 6123

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION


BETWEEN:


CONTI 11. CONTAINER SCHIFFAHRTS-GMBH & CO. KG MS "MSC FLAMINIA"

Claimant

- and -


MSC MEDITERRANEAN SHIPPING COMPANY S.A.

Respondent


————————————————
**PARTIAL FINAL AWARD**
————————————————


**TRIBUNAL**

Julia Dias QC

Sir David Steel

Stephen Hofmeyr QC


EXHIBIT
2

**INTRODUCTION**

1.  By a time charter on an amended NYPE 1946 form (with additional clauses and various addenda) dated 3 November 2000, the Claimant, Conti 11. Container Schiffahrts-GmbH & Co. KG MS "MSC FLAMINIA", the owners of the German flagged vessel "*MSC FLAMINIA*" – Hull No. 4073 ("**the Vessel**"), chartered the Vessel to the Respondent, MSC Mediterranean Shipping Company S.A., for 16 years + 60 days in Charterer's option for worldwide trading.   The Claimant is referred to in this Partial Final Award as the **"Owners"**; the Respondent is referred to as **"MSC"**.

2.  There were various subsequent amendments to the charter.  The amended charter is referred to in this Partial Final Award as "**the Charterparty**".

3.  The Charterparty included the following term:

    "*17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London – English Law to apply, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be shipping men.*"

4.  The Charterparty has given rise to disputes between the Owners and MSC which have been referred to arbitration ("**the Reference**").

**THE ARBITRATION PROCEEDINGS**

5.  On 10 August 2012 MSC appointed Sir David Steel of Arbitrators at 10 Fleet Street, Quadrant House, 10 Fleet Street, London EC4Y 1AU, United Kingdom, as its arbitrator in the Reference and on 22 August 2012 the Owners appointed Mr Stephen Hofmeyr QC of 7 King's Bench Walk, Temple, London EC4Y 7DS, United Kingdom, as their arbitrator in the Reference.  Both arbitrators were appointed in respect of all disputes arising out of the Charterparty.

6.  On 30 April 2019, Sir David Steel and Stephen Hofmeyr QC appointed Lord Clarke of Stone-cum-Ebony, of Arbitrators at 10 Fleet Street, Quadrant House, 10 Fleet Street, London EC4Y 1AU, United Kingdom, as third arbitrator and chair of the tribunal.  On 26 September 2019, due to ill health, Lord Clarke resigned as third arbitrator and chair of the tribunal.

7.  On 27 September 2019, Sir David Steel and Stephen Hofmeyr QC appointed Julia Dias QC of 7 King's Bench Walk, Temple, London EC4Y 7DS, United Kingdom as the third arbitrator and chair of the tribunal to replace Lord Clarke.

8.  For the period until 27 September 2019, Sir David Steel and Stephen Hofmeyr QC are referred to in this Partial Final Award as "**the Tribunal**".   From that date, Sir David Steel, Stephen Hofmeyr QC and Julia Dias QC are referred to in this Partial Final Award as "**the Tribunal**".

9.  Claim Submissions (together with accompanying documents) were served on behalf of the Owners on 8 June 2017.

10. On 18 July 2017, MSC applied for an order that the time for service of Defence Submissions be extended to a date 72 days after receipt by it of Particulars of Claim served by cargo interests with claims subject to English jurisdiction.   The application was opposed by the Owners, who were willing to grant an extension of two months only.   In replying to the application, MSC persisted in its application but, in the alternative, sought a 10-month extension until 8 April 2018.   Each of the parties served yet further submissions and on 2 August 2018 the Tribunal ordered that Defence and Counterclaim Submissions be served on or before 3 November 2018.

11. On 3 November 2017, MSC served Defence and Counterclaim Submissions with supporting documents.

12. In response to a request for an update on the Reference made by the Tribunal to the parties on 4 January 2018, the Owners indicated that they anticipated being able to serve Reply and Defence to Counterclaim Submissions by latest 26 January 2018.

13. On 12 January 2018 MSC served Amended Defence and Counterclaim Submissions with further supporting documents.

14. The Owners served Reply and Defence to Counterclaim Submissions, with supporting documents, on 7 March 2018.

15. The parties having been unable to agree on a date for service by MSC of Rejoinder and Reply to Defence to Counterclaim Submissions, on 4 April 2018, the Owners applied for an order that MSC serve such submissions by 18 April 2018.  This led to MSC, on 10 April 2018, applying for permission to serve Rejoinder and Reply to Defence to Counterclaim Submissions on 7 June 2018, with liberty to apply if this service date was less than 28 days after the date on when cargo interests served their Reply in the English Commercial Court proceedings ("**the English Proceedings**").   MSC's application was opposed by the Owners on 12 April 2018; and, on the same day, the Tribunal declined to grant an open-ended extension of time and ordered that the Rejoinder and Reply to Defence to Counterclaim Submissions be served on 2 May 2018.

16. On 16 April 2018, MSC invited the Tribunal to reconsider its order made on 12 April 2018 in the light of developments in the English Proceedings.  The application was opposed by the Owners. Following MSC's response, the Tribunal extended the time for service by MSC of its Rejoinder and Reply to Defence to Counterclaim Submissions to 10 May 2018.

17. In accordance with the Tribunal's direction, MSC served Rejoinder and Reply to Defence to Counterclaim Submissions on 10 May 2018, bringing the submissions in the Reference to a close.

18. In the months which followed the parties agreed that the Claimant's counsel would circulate to the Respondent's counsel a set of draft directions for the Respondent's consideration and comment; that there should be a directions hearing listed to cater for the possibility that it would not be possible to agree directions; that, subject to the availability of the Tribunal, the directions hearing should be in the week commencing 8th October 2018; and that the issues for the directions hearing would be identified and possibly refined nearer the hearing when the extent to which agreement could be reached became clear.

19. The directions hearing was duly fixed for 1700 on 11 October 2018 but, in the event, was vacated by agreement between the parties to a date to be fixed in the first half of January 2018, subject to the availability of the parties and the Tribunal.   Availability of the parties' counsel in the first half of January 2018 proved to be elusive and on 29 January 2019, the Owners invited the Tribunal to fix a new date for the directions hearing.   The request was renewed on 5 February 2019.   In response, MSC invited the Tribunal to fix dates in June 2019 on the basis that these were the first dates on which their counsel could attend a 5 pm directions hearing.   On 7 February 2019, the Tribunal directed that there be a directions hearing at 5 pm on a weekday in either the week beginning 8 April 2019 or the week beginning 15 April 2019, with an estimate of 2 hours; that the parties seek to agree the least inconvenient date during this fortnight; that, if the parties are unable to agree a date by 6 pm (London time) on 12 February 2019, the Tribunal would fix a date within this window without regard to the convenience of counsel; and that each of the parties serve a position paper at least 24 hours before the directions  hearing.   The Tribunal noted that, had it had availability for a hearing before 8 April 2019, it would have fixed an earlier date.   In the following days, a date and time was agreed: 18 April 2019 at 1700.

20. At the request of the parties, on 3 April 2019, the Tribunal indicated its availability to accommodate a 5-6 week hearing during the periods identified by the parties; and, in order to assist the parties in reaching agreement on a pre-hearing timetable, on 12 April 2019, gave the parties an indication that the Tribunal could see no good reason why the Reference should not be

ready for a hearing in the summer of 2020. The Tribunal also provided the parties with non-binding indications in relation to specific pre-hearing directions.

21. A directions hearing took place at 1700 on 18 April 2019 at the International Dispute Resolution Centre, 70 Fleet Street, London, EC4Y 1EU, each of the parties having served a skeleton argument the day before the hearing. Following the directions hearing Procedural Order No. 1 dated 23 April 2019 ("**PO1**") was agreed by the parties. It made provision for the disclosure of documents, the service of witness statements and expert reports from experts within 12 disciplines and stipulated for a 5-week hearing commencing on 29 June 2019.

22. As noted above, on 30 April 2019, Sir David Steel and Stephen Hofmeyr QC appointed Lord Clarke of Stone-cum-Ebony as third arbitrator and chair of the Tribunal.

23. In the months which followed the parties conducted the disclosure process for which provision had been made in PO1 and disputed requests for disclosure of documents were brought to the Tribunal's attention on 20 September 2019 with a request that the Tribunal rule on those disputed requests. Thereafter the parties helpfully sought further to narrow the disagreements regarding documentary requests.

24. On 26 September 2019, Lord Clarke of Stone-cum-Ebony resigned as third arbitrator and chair; and, on 27 September 2019, Julia Dias QC was appointed to replace Lord Clarke.

25. In the meantime, on 11 June 2019, MSC served Re-Re-Amended Defence and Counterclaim Submissions (together with documentary exhibits) and Amended Rejoinder and Reply to Defence to Counterclaim Submissions; and, on 16 September 2019, the Owners served responsive Amended Reply and Defence to Counterclaim Submissions.

26. On 16 October 2019 the Tribunal produced its ruling on MSC's document requests, reserving any questions regarding costs; and on 18 October 2019 provided further clarification in respect of its ruling.

27. The Tribunal's next involvement in the Reference came on 6 January 2020 when MSC applied for permission to amend the quantum aspects of its Re-Re-Amended Defence and Counterclaim Submissions. The application was made by letter and was accompanied by a draft submission and various documents. Set in context, the application was made 10 days before the date fixed for exchange of witness statements. The application was opposed by the Owners for three

primary reasons.   On 13 January 2020, the Tribunal issued Procedural Order No. 2 ("**PO2**"), allowing the amendments and making necessary changes to the pre-hearing timetable.

28. On 14 January 2020 MSC served Re-Re-Re-Amended Defence and Counterclaim Submissions.

29. By an email message timed at 1831 on 17 January 2020, MSC applied for an extension of time for the service of witness statements which were due to be exchanged on that day.   The application was opposed by the Owners in an email sent the following day.   Later on 18 January 2020, the Tribunal directed as follows:

> "*The Tribunal notes with some surprise that Mills & Co. made no mention of the possible need for an extension of time for service of their witness statements until less than half an hour before the deadline for service, notwithstanding that the facts and matters relied upon in support of the application must have been known to them when they made their application to amend Charterers' Defence Submissions.  In the circumstances, the Tribunal orders witness statements to be exchanged no later than 6.30 pm London time on Monday 20 January 2020. The Charterers are to pay the costs of this application.*"

30. By email messaged timed at 18h31 on 20 January 2020, MSC effectively asked for an extension of 24 hours for the service of witness statements.   The Owners were willing to agree the extension, but only on peremptory terms.   In the event, the Tribunal granted the extension on the strict understanding that, if it were not complied with, a short peremptory order would likely follow.

31. On 30 January 2020, MSC sent an 8-page list of documents to the Owners with a request that the Owners confirm that the documents listed had already been disclosed in the Reference.   MSC requested, further, that, if the documents had been produced, the Owners state where they could be found amongst the disclosed documents, but that, if the documents had not been produced, the Owners explain why they had not been produced.   To put the request in context, it was made on the day before the Owners were required to serve a response to MSC's Re-Re-Re-Amended Defence and Counterclaim Submissions and witness statements responding to MSC's amendments.   Not having received a response from the Owners, on 3 February 2020, MSC applied to the Tribunal for an order that the Owners provide a response by not later than 1700 on 5 February 2020.   In response, the Owners asked to have until close of business on 5 February 2020 within which to answer MSC's request, a request which the Tribunal was willing to grant.   The Owners' response was duly communicated on 5 February 2020.   The issue then went quiet and appeared to have been resolved consensually.

32. In the light of the United Kingdom Government's advice concerning the Coronavirus, on 17 March 2020, the Tribunal invited the parties to begin considering as a matter of urgency what, if any,

contingency plans might need to be put in place to ensure so far as possible that the hearing was effective; and, on 20 March 2020, provided the parties with an example direction for a video-conference hearing.   At the same time it repeated its invitation to the parties to explore contingency plans and stated that any application for an adjournment would not only have to be made promptly, but would also need to explain why contingency plans, using modern technology, initiative, flexibility and proper and careful planning, could not work.

33. An issue in relation to the expert evidence on waste disposal, scheduled for exchange on 27 March 2020, was brought to the attention of the Tribunal on the same day, 20 March 2020.  The issue concerned MSC's desire to adduce evidence on Romanian law.   The Owners invited the Tribunal to direct that there be sequential exchange of expert evidence on waste disposal issues on a *de bene esse* basis.  Various alternatives were canvassed in correspondence on subsequent days.   On 24 March 2020, in the light of the fact that MSC had already provided its expert evidence on Romanian law in draft, the Tribunal ruled that all expert reports be served on 6 April 2020 (including expert evidence on waste disposal/Romanian law), a week later than stipulated for in PO1.

34. On 25 March 2020 the Tribunal was informed that the parties had agreed that the hearing, fixed to begin on 29 June 2020, be adjourned to be refixed for a period of 5 weeks in the hearing window of 21 October 2020 to 23 December 2020.   The agreement was reflected in an agreed Procedural Order dated 25 March 2020 ("**PO3**").   On the same day, the Tribunal provided dates for a re-fixed hearing: 22 October to 20 November (22 days) and three days in the week commencing 14 December 2020.

35. As to the revised timetable, a degree of consensus emerged but certain procedural issues could not be resolved by agreement.

36. Meanwhile, on 1 May 2020, MSC served further proposed amendments to its Re-Re-Re-Amended Defence and Counterclaim Submissions.   The Owners were unwilling to consent to the further amendments and submitted that, if allowed, they would require further factual and expert evidence.

37. In the light of these developments, the Tribunal directed that a half-day Reference Management Hearing ("**RMH**") be fixed for 1400 on 21 May 2020 to take place via a convenient digital platform. On 18 May 2020, the Tribunal issued a hearing protocol.   On 20 May 2020, the Tribunal was informed that the parties had agreed 90% of the content of a procedural order and invited the Tribunal to vacate the RMH, which it duly did.

38. On 29 May 2020 the Charterers informed the Tribunal that they had agreed a revised date and time for the exchange of expert reports of 1630 on 1 June 2020 on final and peremptory terms.

39. An agreed Procedural Order No. 4 ("**PO4**") was sent to the Tribunal on 10 June 2020.

40. Matters concerning expert evidence continued to be contentious and, on 19 June 2020, the Owners applied for directions concerning the conduct of the joint meetings of the experts and for an order excluding the metallurgical expert evidence of Mr David Hughes served by MSC. Given the impending deadline for expert meetings a tight timetable for responsive submissions was imposed. Following receipt of the further submissions, the Tribunal issued Procedural Order No. 5 ("**PO5**") on 23 June 2020.

41. The Owners submitted that PO5 proceeded on a misapprehension about the evidence of Dr Siddons and invited the Tribunal to revisit it. This led the Tribunal to ask to be provided with each of the relevant (firefighting) expert reports, none of which had previously been provided to the Tribunal. Following the receipt of the reports and yet further submissions, the Tribunal directed that any decision on whether there should be a separate meeting between Dr Siddons and Mr Gundermann be deferred until after all the other "liability" expert meetings had been concluded. If at that stage either party was of the view that such a meeting should take place, it should apply to the Tribunal within 7 days of the conclusion of the meetings setting out the reasons for its position. The other party would have 2 days to respond, with a final right of reply within a further 1 day.

42. Matters concerning expert evidence remained contentious and on 4 July 2020 MSC applied for an order formalising the change in the identity of the Owners' chemistry expert witness and extending the date by which expert joint meetings had to be concluded and joint memoranda produced. It also applied for an order extending to 10 July 2020 the date for the exchange of expert supplementary reports. Each of the applications was opposed by the Owners. Following and in the light of further submissions from the parties, the Tribunal directed that the Owners be given permission to substitute Dr Jowett for Mr Hammersley as their expert chemist; that Dr Jowett serve a brief report by 10th July 2020 identifying where he disagreed with Mr Hammersley; that the date for the completion of expert meetings and joint memoranda between all the "liability" experts to be extended to 17 July 2020 with supplementary reports be served by 31 July 2020 (except that supplementary reports of Messrs Jowett and Bound (the latter in so far solely as his report addressed the report of Dr Jowett) to be served by 7 August 2020); and that all

deadlines which had been extended by agreement between the parties be treated as directions of the Tribunal.

43. The unresolved question of whether there should be a meeting between Dr Siddons and Mr Gunderman resurfaced on 6 August 2020 when the Owners invited the Tribunal to direct that a meeting take place between the two experts.   In the event, the issue was resolved by agreement. Then, on 11 August 2020, a yet further issue arose in relation to the Computational Fluid Dynamic (CFD) modelling evidence from Dr Richardson.   The Owners applied for an order prohibiting MSC from adducing any further modelling evidence from Dr Richardson.     This led to discussions between the parties which produced consensus along the lines that the Owners should have liberty to apply in respect of the CFD modelling work referred to in the supplemental expert report of Dr Richardson served on 31 July 2020 and that no further expert evidence should be adduced from Dr Richardson without the permission of the Tribunal.   Given the consensus between the parties, the Tribunal did not consider it necessary (on that occasion) to issue any direction.

44. A pre-hearing review had been scheduled for 10 September 2020 but, in the event, was re-scheduled to 28 September 2020.   In the meantime, on 9 September 2020 the parties agreed a draft Procedural Order No. 6 (**"PO6"**), which the Tribunal endorsed.

45. In advance of the pre-hearing review re-scheduled for 28 September 2020 the Tribunal provided the parties with a draft hearing protocol.   This and other procedural matters were considered at the pre-hearing review following which the Tribunal:

    (a) recorded the agreement of the parties that a further expert meeting take place between Dr Richardson and Dr Leefe as soon as practicable on a date to be agreed between them and a joint memorandum prepared and uploaded to the digital platform as soon as possible thereafter; and

    (b) provided a hearing protocol in final (agreed) form.

46. The agreed hearing protocol was amended by agreement on 29 September 2020.

47. A list of the matters in issue between the parties was prepared by the parties ("**the LOI**").   Although not intended to supersede the pleadings, which remain the primary source of each party's case, the List of Issues provides a helpful point of reference.   The List of Issues is at Appendix I attached hereto.

48. Written Opening Submissions for the Phase 1 hearing were exchanged by the parties and served on the Tribunal on 14 October 2020.

49. On 21 October 2020 a trial run of the videoconferencing technology and the Opus 2 electronic platform, involving both parties and the Tribunal, took place successfully.

50. The Phase 1 hearing took place virtually between 22 October 2020 and 20 November 2020 (with necessary reading breaks from time to time).   During the hearing, the Tribunal sat together in a hearing room at the International Dispute Resolution Centre, 70 Fleet Street, London, EC4Y 1EU. The other participants attended by videoconference.   The Opus 2 electronic platform provided a live transcript during the Phase 1 hearing.   Electronic and hard copy bundles were also made available to the parties and to the Tribunal.

51. On the morning of the first day of the Phase 1 hearing, on Thursday 22 October 2020, following a further joint meeting between the parties' thermodynamics experts, Dr Richardson and Dr Leefe, held on 15 and 16 October 2020, the Owners served an application for (i) an order excluding Appendix 5 of the experts' Second Joint Memorandum and (ii) a first final partial award dismissing MSC's case on Owners' breach/causation.   MSC provided an outline response to the application on the morning of Day 2, Friday 23 October 2020, and submissions on the application were heard by the Tribunal on the same day following the conclusion of oral opening submissions.   The Tribunal dismissed both limbs of the application.   Its ruling may be found on the hearing transcript. While the Tribunal did not make an order excluding Appendix 5 from the evidence, it permitted reliance on Appendix 5 only subject to strict caveats.   First, that Dr Leefe should be given an adequate opportunity to address Appendix 5 and to provide a written response to it.   Secondly, that Dr Leefe's written response should be the end of written exchanges on the matters covered by the expert thermodynamics evidence and that there could be no further reports from Dr Richardson (whether with or without calculations).   The Tribunal ruled, further, that, when the time came for Dr Richardson to give evidence, he would be entitled to defend himself against any further criticisms made by Dr Leefe but not to rely upon any fresh calculations or re-workings of his models.

52. The Tribunal's ruling on the Owners' application to exclude Appendix 5 of the Second Joint Memorandum of the thermodynamics experts caused the parties to agree a revised hearing timetable.   The parties agreed that the "*science evidence going to causation*" would be heard at a separate five-day hearing (Phase 1(b)) to be fixed to commence on 1 February 2021 and that the remainder of the Phase 1 hearing (Phase 1(a)) would be completed within November 2020.

53. On 3 November 2020 Procedural Order No. 7 (**"PO7"**) was agreed between the parties.  PO7 effected a variation of PO6 such that:

(a)  The remainder of the Phase 1(a) hearing would take the form set out in the timetable appended to the Order at Annex 1;

(b)  By reference to the agreed List of Issues, the issues for determination at the Phase 1(a) hearing would be issues 1-5, 7-12, 13, 14 (save that the Tribunal would not be asked to determine the issues in 14.3 but only whether, assuming Charterers were right about the issues in 14.3, they could establish that there was 'effective' causation), 28 and 29.  It was subsequently agreed by the parties that issue 29 did not in fact arise;

(c)  Following the Phase 1(a) hearing, the Tribunal would use its best endeavours to produce an award on all Phase 1(a) issues as soon as realistically possible.   If the production of such an award by 25 January 2021 proved to be impractical or unrealistic, the Tribunal would issue an award on all issues related to the construction of clause 62 only, with an award on all other Phase 1(a) issues as soon as possible thereafter;

(d)  Phase 1(b) of the Reference would take place on 1-5 February 2021. Each party would call its experts on the issues of 'but for' causation and each party's evidence would last for 2.5 days in that period.  The parties' oral closings would occur at the same time as closings in Phase 2 of the Reference;

(e)  A PTR would be fixed at the convenience of the Tribunal and the parties in the week commencing 5 April 2021;

(f)  The Phase 2 hearing would take place between 26 April – 12 May 2021 (for quantum evidence) and 14 – 19 May 2021 (for 'but for' causation and quantum closings).

54. On 9 November 2020, following the oral evidence of Dr Richardson given on 6 November 2020, MSC sent an email message to the Owners (copied to the Tribunal) passing on an email message it had received from Dr Richardson "*following concerns he first raised yesterday* [i.e. Sunday 8 November 2020] *upon rereading the transcript*".   The email message from Dr Richardson was in the following terms:

"*During my evidence I was asked about factors influencing the response time of the CO2 leakage alarm. I advised the Tribunal that the leakage alarm response time would be relatively insensitive to whether the pressure threshold set for the leakage alarm was set at 4 barg or 25 barg (see page 87 line 15 to page 89 line 3 of the transcript), and that the leakage alarm*"

response time would be relatively insensitive to the number of cylinders opened in any given release (see page 85 line 5 to page 87 line 14; page 99 lines 15-20; page 106 lines 11-15 of the transcript). I had not previously analysed these points quantitatively and gave reasoned answers using my intuition. I have since reviewed these points and no longer consider that evidence to be correct for the reasons set out below.

My responses on Friday were predicated on my misapprehension that a single cylinder of $CO_2$ would have provided sufficient flow to drive the manifold pressure to over 25 bar gauge pressure (barg), as was the case for all of the various piping systems reported in Figure 1 of Mr Siddons' supplementary report.

In order to check whether a single cylinder of $CO_2$ would cause the manifold pressure to exceed 25 barg I have calculated estimates for the mass of $CO_2$ that needs to flow into the manifold to achieve 25 barg pressure with the $CO_2$ ball valve closed. As $CO_2$ expands into the manifold it cools. I find that upon opening one cylinder the pressure in the cold fluid would be less than 25 barg, but that 25 barg would eventually be reached as the fluid is heated-up by the relatively warm pipe walls. Heat transfer is a relatively slow process and the need for heat transfer will lead to a delay in the response time of the $CO_2$ leakage alarm if only a small number of cylinders are opened. Without yet having performed heat transfer calculations, I anticipate that this delay might be in the range of tens of seconds to a small number of minutes. With the ball valve closed and in the absence of heat transfer, more than three cylinders would need to have been opened in order to attain 25 barg pressure in the manifold.

If the $CO_2$ ball valve is open, the flow of $CO_2$ out of the manifold will mean that alarm delay times are increased further or, if too few cylinders are opened or the cylinders are opened at sufficiently large time intervals, the pressure might never reach 25 barg. Based on the number of cylinders required to achieve 25 barg with the ball valve closed, I consider it likely that more than three cylinders need to be opened to in order for the manifold to reach the 25 barg pressure threshold with the ball valve open.

In view of the correction provided above, I note that the leakage alarm response time will be affected by the number of cylinders opened, the rate at which cylinders are opened and the leakage pressure sensor set point. The key implications of this correction in relation to the points on which I was questioned are the following:

1.  If the cargo hold $CO_2$ ball valve was closed during the third release, the 08:06:32 $CO_2$ leakage alarm could be explained by around three or fewer cylinders being opened prior to 08:04. It might also be explained by similar or larger numbers of cylinders being opened between 08:04 and around 08:06. Likely it is not consistent with much larger numbers of cylinders being opened prior to 08:04.

2.  If the cargo hold $CO_2$ ball valve was open, a release of three or fewer cylinders starting prior to 08:04 would be unlikely to result in the $CO_2$ leakage alarm sounding at 08:06:32. The 08:06:32 leakage alarm likely would need to relate to more than three cylinders having been opened. A range of start times may be consistent with the alarm depending on the number of and intervals between cylinders opened, including possible start times prior to 08:04.

3.  Opening of a single $CO_2$ cylinder likely would be sufficient to raise the pressure at the $CO_2$ leakage sensor to above 4 barg, irrespective of whether the $CO_2$ ball valve is open.

4. *Considering it likely that when the $CO_2$ ball valve is open the leakage alarm does not respond until more than three cylinders have been opened, my previous estimate for the number of cylinders released during the second discharge based on the duration of the second $CO_2$ leakage alarm will be increased above 10 cylinders (assuming that the $CO_2$ leakage alarm set point remains unchanged). The amount of the increase is dependent on the number of cylinders that can be opened simultaneously prior to the leakage alarm being triggered. If that number is sufficiently large, or if cylinders were opened at a substantially slower rate at the start of the second release, the number of cylinders suggested by the log of the $CO_2$ leakage alarm might then be consistent with the $CO_2$ discharge sequence advanced by Mr Siddons (i.e. 36, 20 and 3 cylinders) (I was questioned about this point starting at page 123 line 5 of the transcript).*

5. *Considering that the first cylinders to be opened in a given release likely are not registered by the alarm log, the average flow rate inferred from the alarm log (as in Richardson's reports) is likely an over-statement of the actual average flow rate. Taking account of flow from cylinders that are opened prior to the leakage alarm sounding would tend to reduce the difference between the flow rate inferred from the alarm log and the flow rate predicted by Richardson's flow rate model. The magnitude of the change will depend how many cylinders are opened before the alarm sounds (I was questioned about this point at page 130 line 6 of the transcript).*

6. *I maintain my view that the most likely explanation for the sequence of alarms is that the $CO_2$ ball valve was closed at the time of the explosion (c. 08:04) and therefore that there was no flow of $CO_2$ into No. 4 hold at that time.*"

55. In MSC's message sent on 9 November 2020 it stated that Dr Richardson would be available to be cross-examined on the contents of the email message.   The Owners objected to what they described as the "*process of unilaterally providing the tribunal with additional evidence*" and submitted that it should stop.   However, they accepted that the Tribunal could have regard to the clarifications made by Dr Richardson in his email message so long as he remained bound by the Tribunal's ruling made on Friday 23 October 2020.

56. On 10 November 2020, MSC applied for permission to adduce additional factual evidence in the form of a witness statement of Valerio Giunta, one of MSC's trade managers.   The rationale for the introduction of the further evidence was stated to be that it was necessary to counter a new, unpleaded case on negligence – that MSC's policy of excluding stowage instructions from the bills of lading that it issues to its shippers was negligent.  Having read Owners' written submissions and heard oral submissions from Counsel, the Tribunal ruled that MSC should have permission to adduce the evidence of Mr Giunta.   As a result, the Owners required that Mr Giunta be called to give oral evidence so that he could be cross-examined; and, in the event, Mr Giunta gave his evidence by videoconference on 12 November 2020.

57. Following the conclusion of factual and expert evidence, on Monday 16 November 2020, the parties exchanged written closing submissions.  Then, on 18, 19 and 20 November 2020 the parties made oral closing submissions.

58. On 16 December 2020, MSC applied to the Tribunal for an order that the Owners serve, by 4 January 2021, any further report from Dr Leefe in response to Appendix 5 to the Richardson/Leefe Joint Memorandum dated 21 October 2020.  The Owners responded the following day, 17 December 2020, resisting the application on the ground that Dr Leefe would not be in a position to comply with any such order, but would be ready to serve a further report by 11 January 2021. Later that day, and in the light of Owners' response, MSC proposed a compromise date, Friday 8 January 2021.   On 18 December 2020, the Tribunal directed that any report from Dr Leefe responding to Appendix 5 to the Leefe/Richardson Joint Memorandum dated 21 October 2020 must be served by 5.00 pm on Friday 8 January 2021.  On Friday 8 January 2021 the Owners sought a short further extension until 9 am on Saturday 9 January 2021.  MSC consented to the extension subject to it being on final and peremptory terms.  In the event, the Tribunal granted the extension on final and peremptory terms.

59. On 21 January 2021 the Tribunal informed the parties that, despite the exercise of all best endeavours, it would not be possible to issue an award – even on the clause 62 issue – by 25 January 2021 and that it anticipated being in a position to issue an award on all Phase 1(a) issues by the end of February 2021.   The Tribunal offered, in the alternative, to issue an award on the clause 62 issue alone by 8 February 2021, with the remainder to follow as soon as possible thereafter.   Following further exchanges between the parties, the Tribunal indicated that it would proceed on the basis that (i) it would endeavour to issue an award on clause 62 by 8 February 2021 or as soon as possible thereafter; (ii) the parties would exchange written closing submissions on the Phase 1(b) issues by 1630 on 26 February 2021; and (iii) the Tribunal would endeavour to issue an award or awards on the Phase 1(a) and Phase 1 (b) as soon as possible, either separately or conjoined as may be appropriate.

60. The Phase 1(b) hearing took place virtually (i.e. by videoconference) between 1 and 5 February 2021.   As a consequence of tighter COVID-19 restrictions, the Tribunal did not sit in one location for the Phase 1(b) hearing.

**ISSUES**

61. The agreed List of Issues summarises the issues which arise in this reference.   Of those issues, Issues 28 and 29 concern clause 62 of the Charterparty.   In its written Opening Submissions for the Phase 1 Hearing, MSC withdrew its assertion that clause 62 is to be construed as a benefit of insurance provision with the consequence that Issue 29 has fallen away.

62. In this Partial Final Award, the Tribunal will determine Issue 28 which the Tribunal was asked to decide as soon as reasonably practicable.

**THE CONTENTIONS, RELEVANT LEGAL PRINCIPLES AND CONCLUSIONS**

63. Set out in the attached reasons ("**the Reasons**") which form part of this Partial Final Award are (i) a summary of the rival contentions of the parties in relation to Issue 28, (ii) the legal principles to which we have had regard in reaching our conclusions on the issue and (iii) our conclusions on the issue.

**DISPOSITIVE AWARD**

**NOW WE**, Julia Dias QC, Stephen Hofmeyr QC and Sir David Steel, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us and given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **PARTIAL FINAL AWARD** as follows:

(a) **WE FIND HOLD AND DECLARE THAT** on its true and proper construction, Clause 62 of the Charterparty does not exclude MSC's liability for loss and damage arising from MSC's fault or negligence in relation to the shipment of dangerous cargo; nor does it preclude the right of the Owners to recover insured losses from MSC caused by MSC's fault or negligence in relation to the shipment of dangerous cargo;

(b) **WE FURTHER AWARD AND DIRECT** that all matters relating to party costs and the incidence as between the parties of the Tribunal's costs and expenses of this Partial Final Award are reserved.

(c)   **WE FURTHER DECLARE** that this **PARTIAL FINAL AWARD** is **FINAL** as to the matters herein determined.

We **RESERVE JURISDICTION** to ourselves to make a further Award or Awards as may be appropriate in respect of any outstanding issues between the parties.

Given under our hands this 8th day of February 2021.

_____

**JULIA DIAS QC**

_____

**SIR DAVID STEEL**

_____

**STEPHEN HOFMEYR QC**

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION**</u>


**BETWEEN:**


**CONTI 11. CONTAINER SCHIFFAHRTS-GMBH & CO. KG MS "MSC FLAMINIA"**

<u>Claimant</u>

- and -


**MSC MEDITERRANEAN SHIPPING COMPANY S.A.**

<u>Respondent</u>


_____

**SECOND PARTIAL FINAL AWARD**
_____


**TRIBUNAL**

Julia Dias QC

Sir David Steel

Stephen Hofmeyr QC

**INTRODUCTION**

1.  The Tribunal issued a Partial Final Award in this Reference on 8 February 2021 ("**the First Partial Final Award**").   This is our Second Partial Final Award in this Reference.

**THE ARBITRATION PROCEEDINGS**

2.  The procedural history of this Reference is dealt with compendiously in the First Partial Final Award and is not repeated.

3.  At the conclusion of the Phase I(b) hearing, on 5 February 2021, the parties indicated that, having reflected further, it would be possible to have all aspects of liability dealt with in advance of the Phase II hearing.  Accordingly, the Tribunal ordered that closing submissions in Phase I(b) would be in writing, to be exchanged on 26 February 2021 and to be followed by supplementary submissions in writing (if so advised),  exchanged on 5 March 2021 and limited to 20 pages if possible.

4.  The parties duly exchanged written submissions in respect of Phase I(b) in accordance with the Tribunal's direction.

**THE ISSUES**

5.  This Second Partial Final Award accordingly addresses all outstanding issues of liability.

**THE CONTENTIONS, RELEVANT LEGAL PRINCIPLES AND CONCLUSIONS**

6.  Set out in the attached reasons which form part of this Second Partial Final Award are (i) our findings of fact, (ii) a summary of the rival contentions of the parties on the outstanding issues of liability, (iii) the legal principles to which we have had regard in reaching our conclusions on these issues and (iv) our conclusions on these issues.

**DISPOSITIVE AWARD**

**NOW WE**, Julia Dias QC, Stephen Hofmeyr QC and Sir David Steel, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us and given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **SECOND PARTIAL FINAL AWARD** as follows:

(a) **WE FIND HOLD AND DECLARE THAT** MSC was in breach of clause 78 the Charterparty in shipping the Cargo otherwise than in accordance with the IMDG Code.

(b) **WE FIND HOLD AND DECLARE THAT** MSC was in breach of Article IV rule 6 of the Hague Rules in shipping the Cargo without giving Owners full information as to its hazardous characteristics such that Owners did not consent to such shipment with knowledge of the dangerous nature and character of the Cargo.

(c) **WE FIND HOLD AND DECLARE** (by a majority) **THAT** MSC was not negligent in so shipping the Cargo.

(d) **WE FIND HOLD AND DECLARE THAT** MSC's breaches of Charterparty were an effective cause of the explosion.

(e) **WE FIND HOLD AND DECLARE THAT** Owners failed in breach of Article III rule 1 of the Hague Rules to exercise due diligence to provide a seaworthy vessel in that the pipework of the Vessel's $CO_2$ system had been incorrectly installed and this should have been detected by a reasonably diligent technician during the periodic scheduled inspections of the system.

(f) **WE FIND HOLD AND DECLARE THAT** Owners did not fail to provide a seaworthy vessel in any other respects.

(g) **WE FIND HOLD AND DECLARE THAT** Owners' failure to provide a seaworthy vessel had no causative impact in relation to the explosion or the crew's response thereto.

(h) **WE FIND HOLD AND DECLARE THAT** Owners did not fail properly and carefully to carry, keep or care for the Cargo in breach of Article III rule 2 of the Hague Rules.

(i) **WE FURTHER AWARD AND DIRECT** that all matters relating to party costs and the incidence as between the parties of the Tribunal's costs and expenses of this Second Partial Final Award are reserved.

(j) **WE FURTHER DECLARE** that this **SECOND PARTIAL FINAL AWARD** is **FINAL** as to the matters herein determined.

We **RESERVE JURISDICTION** to ourselves to make a further Award or Awards as may be appropriate in respect of any outstanding issues between the parties.

Given under our hands this 30th day of March 2021.


**JULIA DIAS QC**


**SIR DAVID STEEL**


**STEPHEN HOFMEYR QC**

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

CONTI 11. CONTAINER SCHIFFAHRTS-GMBH & CO. KG MS "MSC FLAMINIA"

Claimant

- and -

MSC MEDITERRANEAN SHIPPING COMPANY S.A.

Respondent

-------------------------------------

**THIRD PARTIAL FINAL AWARD**

-------------------------------------

**TRIBUNAL**

Julia Dias QC

Sir David Steel

Stephen Hofmeyr QC

**INTRODUCTION**

1. The Tribunal issued a Partial Final Award in this Reference on 8 February 2021 ("**the First Partial Final Award**") and a Second Partial Final Award on 16 March 2021 ("**the Second Partial Final Award**"). This is our Third Partial Final Award in this Reference.

**THE ARBITRATION PROCEEDINGS**

2. We refer to the First and Second Partial Final Awards for the procedural history of this Reference up to the date of the latter.

3. The Phase II hearing took place virtually between 26 April 2021 and 6 May 2021 (oral openings and factual and expert evidence) and 18-19 May 2021 (oral closing submissions) in accordance with an agreed hearing protocol. During the hearing, the Tribunal sat together in a hearing room at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU. The other participants attended by videoconference. The Opus 2 electronic platform again provided a live transcript during the Phase II hearing. Electronic and hard copy bundles were also made available to the parties and to the Tribunal.

4. The parties duly exchanged written submissions in relation to Phase II of the hearing on 21 April 2021 (openings) and 14 May 2021 (closings) in accordance with the Tribunal's directions. Further written submissions on interest were submitted on 17 May 2021.

5. On the morning of the second day of the Phase II hearing, on Tuesday 27 April 2021, MSC applied to amend its Defence and Counterclaim to plead a case of deceit against Owners. The application was refused, on the basis that it was too late and would cause undue prejudice to Owners.

**THE ISSUES**

6. This Third Partial Final Award addresses all quantum issues between the parties.

**THE CONTENTIONS, RELEVANT LEGAL PRINCIPLES AND CONCLUSIONS**

Set out in the attached reasons which form part of this Third Partial Final Award are (i) our findings of fact, (ii) a summary of the rival contentions of the parties on the quantum issues, (iii) the legal principles to which we have had regard in reaching our conclusions on these issues and (iv) our conclusions on these issues.

**DISPOSITIVE AWARD**

**NOW WE,** Julia Dias QC, Stephen Hofmeyr QC and Sir David Steel, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us and given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **THIRD PARTIAL FINAL AWARD** as follows:

(a) **WE FIND HOLD AND DECLARE THAT** Owners' conduct did not break the chain of causation from the explosion to the losses and expenses they sustained as a result of the incident;

(b) **WE FIND HOLD AND DECLARE THAT** the sums of US$105,000, US$38,250, US$7,650, US$23,978 and US$5,000 (together totalling US$179,878) claimed by Owners in respect of works carried out to the vessel's tail shaft, bulbous bow, hatch covers, monorail crane and bow thruster are for Owners' account and are therefore not recoverable from MSC;

(c) **WE FIND HOLD AND DECLARE THAT** Owners are accordingly entitled to recover from MSC damages and/or an indemnity under Article IV rule 6 of the Hague Rules in the sums of €76,253,627.37, US$64,507,682.62, £6,850,940.77, SEK 8,177,532.89, DKK 4,848,440.63 and NOK 49,237.00;

(d) **WE FIND HOLD AND DECLARE THAT,** save that there should be no double counting by Owners in respect of recoveries made by Owners pursuant to sub-paragraph (c) above, Owners are entitled to recover compound interest on all sums awarded at a flat rate of 5% with three monthly rests

from the date of payment, or, where there is uncertainty as to the date of payment, from 28 days after the invoice date.

**WE FURTHER DECLARE** that this **THIRD PARTIAL FINAL AWARD** is **FINAL** as to the matters herein determined.

We **RESERVE JURISDICTION** to ourselves to make a further Award or Awards as may be appropriate in respect of any outstanding issues between the parties.

Given under our hands this 30th day of July 2021.

_____
JULIA DIAS QC

_____
SIR DAVID STEEL

_____
STEPHEN HOFMEYR QC

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION**</u>

**BETWEEN:**

**CONTI 11. CONTAINER SCHIFFAHRTS-GMBH & CO. KG MS "MSC FLAMINIA"**

<u>Claimant</u>

- and -

**MSC MEDITERRANEAN SHIPPING COMPANY S.A.**

<u>Respondent</u>

---

**THIRD PARTIAL FINAL AWARD**
**CORRECTING MEMORANDUM**

---

**TRIBUNAL**

Julia Dias QC

Sir David Steel

Stephen Hofmeyr QC

**INTRODUCTION**

1.  The Tribunal issued a Third Partial Final Award in this Reference on 30 July 2021.

2.  This Correcting Memorandum is issued by the Tribunal pursuant to Section 57 of the Arbitration Act 1996 in order to correct the Third Partial Final Award in the following respect.

3.  The current wording in paragraph (c) of our Dispositive Award, namely *"Owners are accordingly entitled to recover from MSC damages and/or an indemnity under Article IV rule 6 of the Hague Rules in the sums of €76,253,627.37, US$64,507,682.62, £6,850,940.77, SEK 8,177,532.89, DKK 4,848,440.63 and NOK 49,237.00"* is hereby corrected to read as follows:

    **"Owners are accordingly entitled to recover from MSC the sums of €76,253,627.37, US$64,507,682.62, £6,850,940.77, SEK 8,177,532.89, DKK 4,848,440.63 and NOK 49,237.00 by way of damages and/or an indemnity under Article IV rule 6 of the Hague Rules, alternatively (in the case of unpaid hire only) in debt."**

4.  All other terms of our Third Partial Final Award remain unaltered.

Given under our hands this 1st day of September 2021.

_____

**JULIA DIAS QC**

_____        _____

**SIR DAVID STEEL**                          **STEPHEN HOFMEYR QC**